**UNITED STATES of America, Appellee,**

v.

**William J. CINTOLO,
Defendant, Appellant.**

No. 85–1615.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1987.

Decided May 1, 1987.

Francis J. DiMento with whom DiMento & Sullivan, Boston, Mass., Anthony M. Traini, Leppo & Traini, Randolph, Mass., Norman S. Zalkind, Robert L. Sheketoff, Kimberly Homan, David Duncan and Zalkind, Sheketoff, Homan & Rodriquez, Boston, Mass., were on brief, for defendant, appellant.

Max D. Stern and Stern & Shapiro, on brief, for Nat. Network for the Right to Counsel, amicus curiae, and Harvey A. Silverglate, Andrew Good, and Silverglate, Gertner, Baker, Fine, Good & Mizner, Boston, Mass., on brief, for Massachusetts Ass'n of Criminal Defense Lawyers, amicus curiae.

Diane M. Kottmyer, Sp. Atty., Dept. of Justice, with whom Stephen P. Heymann and Jeremiah T. O'Sullivan, Sp. Attys., and Robert S. Mueller III, U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This case deals with the manner in which one member of the criminal defense bar chose, in his own sense, to read and to act upon the bitter letter of the law. In the bargain, the case presents important questions concerning the relation of an attorney to the fabric of federal law which Congress has woven to prevent obstruction of justice.

In December 1984, a grand jury sitting in the District of Massachusetts returned an indictment against William J. Cintolo, a practicing criminal defense attorney, charging him with one count of conspiracy to obstruct justice, 18 U.S.C. §§ 371, 1503, and two substantive counts of obstruction of justice, 18 U.S.C. § 1503. After a lengthy trial, the jury found the defendant guilty on the conspiracy count, but not guilty on the substantive obstruction counts. Cintolo was thereafter sentenced to a prison term, the execution of which was stayed pending appeal. We affirm.

When the sufficiency of the proof is challenged on postconviction appeal in a criminal case, we necessarily view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Medina*, 761 F.2d 12, 16 n. 3 (1st Cir.1985); *United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *United States v. Davis*, 623 F.2d 188, 195 (1st Cir.1980). Drawing all legitimate inferences which tend to support the government's case, *United States v. Patterson*, 644 F.2d 890, 893 (1st Cir.1981), and resolving any conflicts in the evidence against the appellant, *United States v. DeLucca*, 630 F.2d 294, 300 (5th Cir.1980), *cert. denied*, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981), our task is to determine whether "the evidence in its totality, taken in the light most flattering to the government, together with all legitimate inferences to be drawn therefrom, [are enough that] a rational trier of the facts could have found the appellant guilty beyond any reasonable doubt." *Tierney*, 760 F.2d at 384. *See also United States v. Drougas*, 748 F.2d 8, 15 (1st Cir. 1984); *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964). With that standard in mind, we proceed to survey the evidence adduced in this case.

## I.

Cintolo's indictment and ultimate conviction grew out of the judicially sanctioned electronic surveillance of an apartment at 98 Prince Street in Boston's North End. These premises were used by Gennaro An-

giulo and his associates [1] as a headquarters and office for the operation of illegal gambling and loansharking businesses. "Loansharking" is a term of criminal art which may roughly be defined as the unlawful lending of money at usurious rates of interest, repayment being encouraged by the employment (or threatened employment) of unorthodox collection measures, involving, *inter alia,* the breaking of bones.

The Federal Bureau of Investigation (FBI) monitored the conversations which took place on the premises from January 19 to May 3, 1981. The surveillance was conducted primarily by means of hidden microphones clandestinely emplaced within the apartment. These devices recorded conversations between Angiulo and his confederates, including Cintolo. In addition, a concealed exterior camera surreptitiously photographed persons entering and leaving the headquarters.

What this intensive scrutiny revealed vis-a-vis the appellant can usefully be summarized by reference to the true bill which the grand jury returned. The indictment charged that Cintolo conspired with Angiulo and others to violate 18 U.S.C. § 1503.[2] The gravamen of the accusation was that Cintolo did "corruptly endeavor to influence, obstruct and impede the due administration of justice" by befouling the proceedings of a federal grand jury investigating the criminal activities of the Angiulo gang. According to the indictment, Cintolo set out to accomplish this nefarious end through the use of his position as attorney of record for Walter LaFreniere, a witness before the grand jury, to acquire information about the ongoing investigation for Angiulo's benefit. The indictment further charged Cintolo with knowingly assisting Angiulo in his efforts to inhibit LaFreniere, after the latter had been granted immunity, from testifying truthfully before the grand jury, or from cooperating in any way with the investigation.

Tape recordings played for the jury at Cintolo's trial [3] established that LaFreniere and his father-in-law, Louis Venios, possessed damaging information linking various members of Angiulo's organization to illegal gambling and loansharking activities. Among other things, the evidence disclosed that both Venios and LaFreniere had been extended substantial credit to cover unpaid gambling debts, and that each had been subjected to exacting pressure from various of Angiulo's minions to remit the overdue sums. When subpoenas issued to Venios and LaFreniere indicating that the grand jury was investigating possible violations of 18 U.S.C. §§ 892–94 (making, financing, and collecting extortionate extensions of credit), Angiulo recognized the legal peril which faced him and his confreres. Notwithstanding that on March 12, 1981, after first being interviewed by FBI agent Quinn, LaFreniere appeared before the grand jury and refused to testify on fifth amendment grounds, Angiulo remonstrated with his brother, Donato:

> Remember, they're not sayin' this or this or that. They're saying, "Angiulo" ... "Angiulo." It might be me, you, him, him, and him, too. Nobody knows. Under RICO, no matter who ... we are, if

---

1. Several of Gennaro Angiulo's relatives, many bearing the family surname, figure in the events at issue. Members of the Angiulo organization with whom Cintolo is alleged to have conspired included, among others, Gennaro Angiulo's four brothers—Donato, Francesco, Michele and Nicolo—and his son, Jason Angiulo. Wherever the context permits, we will refer to Gennaro Angiulo simply as "Angiulo," and will refer to other persons named Angiulo either by their first names or by their full names.

2. The statute provides in material part that:
 Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or en-

deavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1503.

3. The tape-recorded conversations which are in evidence are punctuated throughout with profanity of every sort imaginable. We will routinely delete (without employing any special signal) all expletives from the portions of these conversations which we have reason to quote, unless the use of such cursewords is in our judgment essential to place the remarks in perspective.

we're together, they'll get every ... one of us.

\* \* \* \* \* \*

We've been sleepin'.... As soon as that ... guy got that ... summons, shoulda got a kid like Cintolo and said, "You hire a ... detective and tell him to stand at that grand jury. I want to know everybody that goes in there."

Following extended discussions among Angiulo and his cohorts, assessing the extent of LaFreniere's knowledge and speculating on the possible foci of the grand jury's investigation, Donato Angiulo sent LaFreniere to meet with the appellant. Shortly thereafter, the lawyer assembled with Gennaro Angiulo and others—not including LaFreniere—to discuss the sweep of the grand jury inquiry and Cintolo's newfound "client." At this session, Angiulo told Cintolo that "about three and a half, four weeks ago, ... these guys should have gotten you and told you what I wanted." Angiulo explained that LaFreniere had been delivering payments to him on behalf of Venios, and that LaFreniere's name appeared on a "cuff sheet," *i.e.*, a written list kept to show amounts of borrowings and identities of borrowers. (The cuff sheet in question related to an illegal "barbooth game" operated by Angiulo's son, Jason.)

Angiulo then told Cintolo the questions which had been propounded to Venios before the grand jury. These questions concerned, *inter alia*, whether Venios had ever "okay[ed] Walter LaFreniere for money with someone or anyone on the shylock." (In the vernacular, "shylock" and "loanshark" are roughly synonymous terms.) Venios's discretion and loyalty had been tested over time, and Angiulo appeared to have considerable confidence in him. Yet, Angiulo was plainly apprehensive over the family's potential exposure should LaFreniere fail to "stand up," *i.e.*, to go to jail rather than to testify truthfully before the grand jury. Angiulo mused, "why is this worrying me? This kid owes money on the shark.... [H]e's gotta be protected. This kid should never have gone to the grand jury by himself."

The appellant immediately reassured Angiulo. Cintolo told him that he had already "got out of" LaFreniere a list of the questions asked both in the FBI interview and in the grand jury. Cintolo then recounted these questions and LaFreniere's responses thereto for Angiulo's benefit. The conversation concluded with Angiulo instructing the appellant to call LaFreniere in and size him up. Angiulo told Cintolo: "I got a decision to make. I want to have it all in front of me. Louis I can believe. This kid? Double talks."

On March 19, 1981, Wendy Collins, a federal prosecutor, notified LaFreniere to report to the grand jury the following Thursday. That evening, Cintolo spoke with Angiulo:

Angiulo: You going to explain to him that you feel that he's gonna get immunity? There's no other way out of it, is there? Huh?

Cintolo: No. I, I'll explain it to him. Figured somebody else might want to talk to him first....

Angiulo: His father-in-law says already that as far as this kid is concerned, one thing you can say he's a ... man. If he's got time to do, he'll do it. But I don't think they figure on immunity. You understand? They're not that ... smart. Did we find out anything about this grand jury?

Cintolo: Nothing yet.

Angiulo: I would say you call him in, have a good talk, and give me a reaction.

Cintolo: Yeah.

Angiulo: So that this kid understands that he might just go and do eighteen ... months.

Later that evening, Angiulo conferred with two of his henchmen, Richard Gambale and Peter "Doc" Limone, soliciting their views as to whether LaFreniere would "stand up." Apparently uneasy at what he heard, Angiulo ordered them to kill LaFreniere:

Tell him to take a ride, Okay? Went somewhere, the kid will just say to you, get out of the car and you stomp him.

Bing! You hit him in the ... head and leave him....

Meet him tonight.... Just hit him in the ... head and stab him, okay. The jeopardy is just a little too much for me.

FBI agents monitoring the electronic surveillance equipment overheard Angiulo hand down this death sentence. They moved immediately to warn the intended victim. LaFreniere acknowledged that he had been contacted and was scheduled to meet with "someone" later that day. He refused to disclose the identity of the person who had made the overture, but Gambale subsequently revealed himself to the government's electronic ear as the mystery caller, informing Angiulo that LaFreniere had resisted his suggestion that they meet "for a drink."

On March 20, Angiulo was told that LaFreniere had been attempting to reach Cintolo. Angiulo advised the lawyer that LaFreniere had been tipped about the "contract" which had been placed on his life:

[T]he Feds called him and said to him, "we got an informant in the North End. He just informed us that you have been placed on the hit list down there...." Words to that effect.

Cintolo's only response to this grisly piece of news was to mention calmly that he had instructed LaFreniere to talk with no one, and to refer all calls to him. Angiulo continued:

They, supposedly, they told him, "look, what we're telling you, don't repeat it, 'cause you'll blow the cover of the guy we got down there talking to these people who knows what it's all about." Very, very interesting. Because, nowhere along the line did anyone talk about handling it. More important than that, if someone did talk about it, though ... no way would they talk where it would be, aah, susceptible to anyone excepting individuals that would be interested in it to begin with.

This particular conversation concluded with Angiulo instructing Cintolo to meet with LaFreniere again and "to evaluate [the situation] very carefully."

There followed a series of discussions at the apartment in which Angiulo voiced grave (and mounting) concern over his organization's vulnerability vis-a-vis LaFreniere. The recurring theme of each conversation, significantly, was that LaFreniere be coerced into "standing up"—to serve an eighteen month sentence for contempt—rather than to accept immunity gracefully and testify freely before the grand jury. Angiulo ordered that pressure of divers kinds be brought to bear. At one juncture, he suggested that LaFreniere be told:

Hey you, you answer these ... questions you're gonna get yourself in trouble, you're gonna get everybody in trouble. Do yourself a ... favor.... Go to the can until we find out a little more about this ... thing.

At another point, Angiulo instructed William "Skinny" Kazonis, another crony, that he was not to allow LaFreniere to tell the truth under any circumstances:

He's gotta be taken out and told ... he's not answering.... First, we're gonna try to find out, to know a little more than what they found. Second, it's your ... responsibility to make sure this kid keeps his ... mouth shut....

Much the same sentiments were communicated to Venios:

Angiulo: He's got immunity.

Venios: Yah.

Angiulo: In plain English, he either answers or he's going to jail.

Venios: .... to jail, yah.

Angiulo: We're all set up for him?

Venios: Yah.

During this same meeting, Angiulo explained that his own son, Jason, was in an equivalent position. "He can answer until they ask him the $64 question, which is the question that will get somebody in trouble. After that, just pack it in and go to the can." Angiulo repeatedly reminded Venios of the jeopardy which any cooperation by LaFreniere with the grand jury would pose, and for good measure added a thinly-veiled threat:

If this kid has got the smarts, I'm gonna tell him to go in and answer some of these questions. Then Billy will defend

him for perjury. What ... is the difference whether he does eighteen for the grand jury or he gets three years for perjury?

Angiulo later told the appellant of Venios's continued assurances that LaFreniere would "stand up." According to Angiulo, Venios had been ordered to remind his son-in-law that this was no avuncular request, but a command from the organization: "You got to tell this kid that we said it, not you. Us. No guy will go to the can here for any reason." So, Angiulo indicated, Cintolo's "client" fully appreciated the personal risk he would run by cooperating with the grand jury.

In the course of the conversation, Angiulo remarked to Kazonis, "Drink up, Skinny, you might go away tomorrow ... obstructing justice. Right, Billy?" The following exchange then took place:

Cintolo: .... And I went over that with him very, very carefully. That the maximum you can do is eighteen months or the life of the grand jury, whichever is shorter.

Unknown Male: Yeah.

Angiulo: Coming from you.

Cintolo: And then he said to me, "how long does the grand jury sit?" I said, "the grand jury sits for thirty-six months."

Angiulo: Well he's thick, he doesn't understand about thirty-six months. But you gotta understand, coming from you that's the story. Coming from him, that's saying "Listen I was there, ..., and no matter where you go, might take, might take a week, two weeks, three weeks to get to you, but we'll get to ya." Do you understand? Do you understand what I'm talking about? The difference.

Kazonis: Well I convinced him already, for tomorrow forget about....

Angiulo: In fact, what he wanted to do was, when he got through with Skinny, he wanted to just go home and get his ... underwear and go, go, go away.

On March 26, in Cintolo's absence, Angiulo described how LaFreniere had reacted to Kazonis's importunings:

"The lawyer told me I had to go do thirty-six months. I told my wife, I gotta go away for three years. Crazy, my lawyer expects that. Don't tell me," he says, "*[the] lawyer talked to me; he told me to go away for thirty-six months.*" (Emphasis supplied).

On March 31, the appellant met briefly with Angiulo to plot strategy. By this time, it was obvious that Jason—who had been subpoenaed by the grand jury—was a target of the investigation and would not be offered immunity. Cintolo was, according to the plan which he and Angiulo had mapped out, to represent Jason as well as LaFreniere. The lawyer suggested that he could "have [Jason] plead the fifth." To this, Angiulo responded:

Not yet, we shouldn't. No, sir. We didn't learn nothing. You understand, I want the questions specifically, and somewhere along the line he'll be indoctrinated by me, if you wanna call it that.

When Cintolo said that he would "like to try to appeal" any court order disqualifying him from dual representation of both of these "clients," Angiulo rejoined: "Why would you like to do anything? We are here only to discuss all of the ultimate measures to tell them to go [perform an anatomically unlikely act upon] themselves."

On April 1, LaFreniere received immunity, thereby stripping him of the fifth amendment's protection against compelled self-incrimination. Nothing daunted, Cintolo continued to participate in discussions with Angiulo and his subordinates in which the anticipated commission of contempt before the grand jury was frankly acknowledged as an objective. At one point Cintolo remarked, "they've got to figure if they can isolate [LaFreniere] in a sense ... *if they can pull him away from me,....* Okay. *If they can pull him away from me, then maybe they get something out of him.* Whether he's gonna voluntarily do it, or just by sheer ignorance he's gonna blurt it out. I think that's what they want." (Emphasis supplied). Moments later, Cintolo added:

I talked to him.... to evaluate what he's saying to me—in fact, it was like I do with everybody: instill confidence in them, you know. I kept telling him, "I might not be able to help you out, but I can tell ya, I'll fight like a son of a...." *To get him into a confident situation, making him think that we can do what we're saying we can do, and all of a sudden smack, he's a ... goner.* (Emphasis supplied).[4]

Discussions regarding the grand jury investigation continued throughout the month of April. The appellant was a regular participant. In one conversation, the group attempted to identify an individual whom they had spotted and believed to be an informant. In response to a query by Cintolo, Angiulo gave the following chilling command: "I don't want to know about this guy no more. I want [Kazonis] to go see him.... We'll ... kill him once and for all."

■ On April 23, LaFreniere appeared before the grand jury and, reading a statement prepared for him by Cintolo, refused to testify. Notwithstanding the immunity which had been conferred, the refusal was predicated on fifth amendment grounds. At a hearing on the government's ensuing motion to compel, the duty judge dismissed Cintolo's argument that the immunity bestowed upon LaFreniere was somehow inadequate as "clearly frivolous."[5] Upon leaving court, the appellant went directly to 98 Prince Street. Angiulo greeted him with the question, "Is he in jail, just say yes or no?" Cintolo responded, "Not yet."

The two men then dissected what had transpired at the grand jury in minute detail. At one point, the appellant informed Angiulo that the grand jury had queried LaFreniere about the contract on his life, volunteering that "I think they know about Richie [Gambale] and Peter [Limone]." When Cintolo mentioned that LaFreniere had already admitted having received an "invitation" to "meet," Angiulo remarked that Gambale had indeed ventured such an initiative. "The dirty part of this, there's no fiction here. They don't have to fictionalize. He'll give them the pieces. They'll put the puzzle together." Then, Cintolo adverted to LaFreniere's professed desire to answer a few of the grand jury's questions. The following exchange took place:

Angiulo: That's why I think it's starting to enter his mind, Billy. I don't like the answers.

Cintolo: Maybe a couple of times, couple of ... "Why couldn't I answer these questions?"

Angiulo: Your answer to him is gonna be, when he says that to you, "Hey Walter, let me tell you something, huh: don't ever come back to haunt me. With one of these questions, you're gonna commit perjury because instead of doing eighteen months you gonna ... go for five years." But how you give it back you better be very ... careful.... You hear me: very important, Billy, you gotta feel him out.

On June 2, 1982, LaFreniere was held in contempt in federal district court and was sentenced to an eighteen month term of incarceration, which he served in full. Cin-

---

**4.** During this same conversation, Cintolo sought Angiulo's permission to "change the subject," and proposed a scheme whereby he would use his position as an attorney to shield members of Angiulo's illegal gambling and loansharking enterprises from their just deserts as tax evaders. The admissibility of this evidence is discussed *infra* at Part IV (3).

**5.** We note, at this juncture, that we have never been offered any plausible explanation of how—if at all—the grant of immunity to LaFreniere was deficient. The district court and the jury were similarly unenlightened. Cintolo had argued, and persists in contending on this appeal, that the grant of immunity was somehow "not coextensive" with LaFreniere's fifth amendment

rights, *i.e.*, that the immunization did not foreclose the possibility that inconsistencies with prior grand jury testimony could subject him to charges of perjury. This argument was—and is—a transparently invalid one. The law is settled that a grant of immunity precludes the use of immunized testimony in a prosecution for *past* perjury (though affording no protection against *future* perjury). *See, e.g., In re Bianchi,* 542 F.2d 98, 100 (1st Cir.1976). This well established law, coupled with Cintolo's candid admissions to Angiulo that the tactic would not save LaFreniere from contempt charges, undermines the credibility of the appellant's claim that he gave the legal advice in question to his nominal client (LaFreniere) in good faith.

tolo represented him throughout the entire period of his immurement. He was disqualified by court order, however, from continuing to appear for Jason Angiulo.

At his own trial, appellant testified that, although he was aware of Angiulo's involvement in illegal businesses, he had not acted with the intent corruptly to obstruct or impede justice while representing LaFreniere. To the contrary, he claimed to have been cooperating—or pretending to cooperate—with Angiulo solely to enhance his ability to counsel his true client (LaFreniere). The jury obviously disbelieved these assertions and drew a different set of inferences.

## II.

From the facts established at trial, a sampling of which we have set out above, we find overwhelming evidence of a conspiracy among Angiulo and his associates to pressure LaFreniere—at all costs and by the nearest means—so as to prevent his testifying before the grand jury; in short, a conspiracy to violate 18 U.S.C. § 1503. Drawing reasonable inferences from the evidence in the light most hospitable to the government, we have no difficulty recognizing that the defendant lent his informed assistance to this conspiracy. Indeed, Cintolo's counsel conceded as much at oral argument of this appeal, when he stated:

Cintolo knew that Gennaro Angiulo was doing his level best to influence Walter LaFreniere through other people, including Walter LaFreniere's father-in-law, Louis Venios, to persuade Walter LaFreniere to "stand up"—in the vernacular, to refuse to testify—even though immunized, and to do an eighteen month sentence for contempt. There is no question that the evidence makes out a conspiracy, of which Gennaro Angiulo was at the head, to influence LaFreniere. And there is no question that Cintolo, knowing that, continued to represent LaFreniere ... partly with a purpose to gain time and partly with a purpose to obtain information. Secondly, he passed on such information as he did have to the Angiulos—as, for example, what ques-

tions were being asked [in the grand jury]. Indeed, most everything he did played into the hands of Gennaro Angiulo.

Cintolo argues, however, that appearances are deceiving in this case; that his authentic motive in pursuing this perilous course of conduct was to obtain information from Angiulo that would assist him in representing the interests of LaFreniere. He portrays himself as a double agent of sorts, using the ringleader of the mob as the ringleader was attempting to manipulate him. While admitting that his behavior conferred benefits on Angiulo and on the hoped-for conspiracy of silence, the appellant maintains that those rewards were "incidental" to his obligation to represent LaFreniere as he thought best. Inasmuch as he did not intend to obstruct justice, the thesis runs, he cannot be guilty of conspiring to commit the substantive offense.

The short answer to this plaint is that the jurors, armed with considerable circumstantial evidence to support their assessment of the situation, deemed these protestations to be apocryphal. The slightly longer—but no less damning—answer is that the self-serving gloss which appellant thus places on the evidence manifestly misapprehends both the jury's factfinding function and our role in the review of the verdict. The jury was reasonably entitled to disbelieve Cintolo's testimony regarding his motives and to credit the (entirely plausible) contrary interpretation urged by the government. *E.g., United States v. Cisneros*, 448 F.2d 298, 305 (9th Cir.1971) ("A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn."). *Accord United States v. Machado*, 804 F.2d 1537, 1549 (11th Cir.1986); *United States v. Allen*, 797 F.2d 1395, 1399 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986); *United States v. Robinson*, 774 F.2d 261, 278–79 (8th Cir.1985). Given that appellate oversight of this con-

viction must presume that the jury bought what the prosecution was selling, and recognizing that, in order to convict, the evidence need not exclude every reasonable hypothesis of innocence, we find adequate record evidence to sustain the conclusion that Cintolo knowingly and intentionally furthered the corrupt ends which Angiulo and his companions sought to achieve. Indeed, the evidence makes abundantly clear the sentient, purposeful participation by Cintolo in the scheme to envelop LaFreniere in pressure and intimidation so as to forestall any cooperation on his part with the grand jury. The fact that this participation was clothed, at least in part, in the mantle of superficially "professional" conduct does not exonerate the lawyer from culpability.

■ We understand the defendant's argument that all of his conduct in the course of representing LaFreniere—meeting with Angiulo and his crew, shuttling information from the grand jury investigation to them, urging LaFreniere to invoke the fifth amendment privilege long after immunity had dissipated it—was performed with LaFreniere's consent. But, even were we inclined to credit the claim that LaFreniere *voluntarily* acceded to actions by Cintolo aimed at sending him to jail in order to protect the Angiulo clan, no effective defense avails to Cintolo as a result. In any realistic light, the most authentic victim of Cintolo's behavior was not his nominal client, but the due administration of justice. When federal law was violated, LaFreniere was powerless to legitimate the infraction by consenting to the commission of a crime.

This notwithstanding, appellant and the amici beseech us to announce an unprecedented rule of law designed, they contend, to insulate lawyers from encroachments on the "zealous representation" of clients accused of crime. So long as an attorney tenders a facially legitimate explanation for conduct performed in the course of his defense of a client, they urge, a factfinder must evaluate the behavior *on that basis.* In constructing this sort of paradigm, the lawyer's word alone creates what amounts to an irrebuttable presumption which de-

bars the jury—despite the existence of mounds of circumstantial evidence—from drawing contradictory inferences as to the attorney's motives or intent. Put another way, if defense counsel's actions of and by themselves do not amount to a crime, then a factfinder may not criminalize the conduct on the basis of conclusions reached, no matter how reasonably, about *why* the actions were performed. Hidden motivations, howsoever corrupt, remain forever hidden in a world where veniremen are not allowed to peer beneath the surface of things.

■ We find no support in precedent, principle, or policy for such an anti-lapsarian rule, and decline to cleave so deep a chasm in the criminal law for the exclusive benefit of attorneys who knowingly involve themselves in the corruption of their clients. As important a role as defense counsel serve—and we do not minimize its importance one whit—the acceptance of a retainer by a lawyer in a criminal case cannot become functionally equivalent to the lawyer's acceptance of a roving commission to flout the criminal law with impunity. A criminal lawyer has no license to act as a lawyer-criminal.

The omnibus clause of 28 U.S.C. § 1503 makes it a felony to "corruptly endeavor to influence, obstruct or impede ... the due administration of justice." We have previously held that "[a]n effort to alter the testimony of a witness for corrupt purposes is plainly an endeavor to impede the due administration of justice." *United States v. Tedesco,* 635 F.2d 902, 907 (1st Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981). It is altogether clear that interference with a grand jury investigation fits snugly within the contemplation of § 1503. *E.g.,· United States v. Howard,* 569 F.2d 1331, 1337 (5th Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 116, 58 L.Ed.2d 130 (1978); *United States v. Walasek,* 527 F.2d 676, 678 (3d Cir.1975); *United States v. Campanale,* 518 F.2d 352, 366 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Hubbard,* 474 F.Supp. 64, 77 (D.D.C.1979). It is equally clear, from

both the plain meaning of the statutory language and the caselaw interpreting it, that § 1503 criminalizes conduct which obstructs or impedes the due administration of justice, provided such conduct is undertaken with a corrupt or improper purpose.

■ We have held before, and reaffirm now, that "[i]f reasonable jurors could conclude, from the circumstances of the conversation[s], that the defendant had sought, however cleverly and with whatever cloaking of purpose, to influence improperly a [witness], the offense was complete." *Tedesco,* 635 F.2d at 907 (quoting *United States v. Lazzerini,* 611 F.2d 940, 941 (1st Cir.1979)). *See also United States v. Lazzerini,* 611 F.2d 940, 941 (1st Cir. 1979) (quoting *United States v. Roe,* 529 F.2d 629, 632 (4th Cir.1975)). Correct application of § 1503 thus requires, in a very real sense, that the factfinder discern—by direct evidence or from inference—the motive which led an individual to perform particular actions. As Justice Holmes once aptly observed, "[i]ntent may make an otherwise innocent act criminal, if it is a step in a plot." *Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916). The appellant's suggestion that the jury be precluded, as a matter of law, from drawing its own (reasonable) conclusions as to why any defendant—or, more narrowly put, a lawyer-defendant—committed acts not unlawful in and of themselves would do enormous violence to the statute and play unwarranted havoc with its enforcement.

We decline the invitation to rewrite the obstruction statute in such a sweeping fashion. Adoption of the rule which the appellant and the amici urge upon us would effectively divest the jury of the critical factfinding role which Congress, in the en-

actment of § 1503, specifically entrusted to it. Professors LaFave and Scott accurately note that "there are a number of instances in which ... inquiry into why an act was committed is crucial in determining whether or not the defendant has committed a given crime." W. LaFave & A. Scott, *Handbook on Criminal Law* 204 (1972). We find such an inquiry to be appropriate, indeed statutorily required, in the precincts patrolled by 18 U.S.C. § 1503.[6]

■ Once it is conceded that the existence *vel non* of intent under § 1503 is a question of fact for the jury, it remains to define the parameters of behavior that can fairly be labelled as "corrupt," ergo, criminal under the statute. General definitions tend to be circular. It has been said, for instance, that "[t]he term 'corruptly' is the specific intent of the crime." *United States v. Brand,* 775 F.2d 1460, 1465 (11th Cir.1985). Yet, the term is admittedly susceptible to different meanings in different contexts. *See United States v. Partin,* 552 F.2d 621, 642 n. 26 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Courts have tended to interpret the requirement broadly, holding that it applies to the ends of an actor's conduct rather than merely the means. *E.g., United States v. Howard,* 569 F.2d at 1334–35 ("the omnibus clause aims at obstruction of justice itself, regardless of the means used"), and cases cited therein. Thus, any act by any party—whether lawful or unlawful on its face—may abridge § 1503 if performed with a corrupt motive.

Our sister circuits have spoken to this subject with a single voice. "Any corrupt endeavor whatsoever, to 'influence, intimidate or impede any ... witness, ...' whether successful or not, is proscribed by the obstruction of justice statute." *Catri-*

---

**6.** Having made the argument that a jury may never draw inferences of corrupt intent from a lawyer's actions performed within the scope of an attorney-client relationship, the appellant nevertheless concedes that "attorneys ... whose nonprotected conduct constitutes an endeavor to obstruct justice within the purview of the omnibus clause may be prosecuted under § 1503." The amici likewise hypothesize that an attorney who sought to delay the grand jury, in order to afford his client additional time

lawlessly to flee the jurisdiction, could be subject to prosecution under the obstruction statute. We find those positions in accord with our own reading of § 1503—and curiously at variance with the defense's central thesis. It seems to us that these concessions belie the notion that a lawyer's actions in the course of representing a client are presumptively immune from a finding of malevolent intent sufficient to criminalize the conduct.

*no v. United States,* 176 F.2d 884, 887 (9th Cir.1949) (footnote omitted). *Accord Falk v. United States,* 370 F.2d 472, 476 (9th Cir.1966), *cert. denied,* 387 U.S. 926, 87 S.Ct. 2044, 18 L.Ed.2d 982 (1967). "The statute reaches all corrupt conduct capable of producing an effect that prevents justice from being duly administered, regardless of the means employed." *United States v. Silverman,* 745 F.2d 1386, 1393 (11th Cir. 1984). *See also United States v. Howard,* 569 F.2d at 1335 (similar); *Samples v. United States,* 121 F.2d 263, 266 (5th Cir.) (§ 1503 is "broad enough to cover any act, committed corruptly, in an endeavor to impede or obstruct the due administration of justice."), *cert. denied,* 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530 (1941). These formulations sound a common theme: they uniformly signal that means, though lawful in themselves, can cross the line of illegality if (i) employed with a corrupt motive, (ii) to hinder the due administration of justice, so long as (iii) the means have the capacity to obstruct.

The appellant and the amici pay lip service to this principle, but maintain that different considerations come into play where criminal defense lawyers are concerned. In those purlieus, they assert, a corrupt motive may not be found in conduct which is, itself, not independently illegal. We regard this argument as being in conflict with persuasive caselaw, and as wrongheaded from the standpoint of sound public policy.

In *Cole v. United States,* 329 F.2d 437 (9th Cir.), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964), the court affirmed the § 1503 conviction of an individual who had pressed a grand jury witness to stand mute by invocation of his fifth amendment prerogative. The defendant's motive, the prosecution contended, was to protect both himself and a close friend from the slings and arrows of a pending grand jury investigation. The Ninth Circuit noted that: "the constitutional privilege against self-incrimination is an integral part of the due administration of justice, designed to do and further justice, and to the exercise of which there is an absolute right in every witness." *Id.* at 443. Nevertheless, while "[a] witness violates no duty to claim it, ... one who bribes, coerces, forces or threatens a witness to claim it, or advises with corrupt motive the witness to take it, can and does himself obstruct or influence the due administration of justice." *Id.*

*Cole,* to be sure, did not involve a lawyer-client relationship. Yet the case explicitly suggested that an attorney who *corruptly* advised a client to wind the toga of the fifth amendment about him could well be subject to obstruction of justice liability notwithstanding any "privilege" he might claim to have in rendering such advice. *Id.* at 440 (dictum). After all, the highminded purposes which underlie the constitutional protection are disserved, not furthered, if a third party—lawyer or not—has carte blanche to manipulate an individual's use of the privilege corruptly to impede the due administration of justice.

To like effect is the decision in *United States v. Cioffi,* 493 F.2d 1111 (2d Cir.), *cert. denied,* 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974). There, the Second Circuit affirmed a conviction for conspiracy to obstruct justice. The defendant, Cioffi, was a man who had tried to induce a grand jury witness, one Scheer, to take the fifth amendment rather than inculpate certain third parties who were under investigation for loansharking. The court observed that, "[k]nowing that the loan had in fact been made and the extortionate interest paid, all to the personal knowledge of Scheer, an endeavor to induce Scheer ... to plead the Fifth Amendment for the purpose of protecting [the shylock] was obviously corrupt." *Id.* at 1119. The Second Circuit flatly rejected the hypothesis that advising a witness to do that which he possessed a constitutional right to do could not be criminalized. In charting such a course, the court reaffirmed the prevailing principle that "[t]he focus [under 18 U.S.C. § 1503] is on the intent or motive of the party charged as an inducer. The lawful behavior of the person invoking the [Fifth] Amendment cannot be used to protect the

criminal behavior of the inducer." *Id.*[7] *Cioffi*, like *Cole*, stands ultimately for the proposition that otherwise lawful means can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.

These cases are instructive for the purposes at hand. Notwithstanding that the means used by the appellant might be regarded as lawful, if viewed in a vacuum, clear proof of improper motive could surely serve to criminalize that conduct. And, Cintolo's corrupt intent seems especially evident when contrasted with the actions scrutinized in the foregoing cases. Viewing the facts and the inferences therefrom most favorably to the government, as we are required to do, there was an ample basis for the jury to find—in significant contradistinction to *Cole* and *Cioffi*—that the appellant was not counseling LaFreniere to invoke legitimate rights for his own benefit. On this unhappy record, a factfinder could well have believed beyond a reasonable doubt that Cintolo acted as part of a high pressure, no-holds-barred campaign to induce his nominal client, LaFreniere, to commit a criminal contempt. Though Cintolo's acts in fostering the intimidation of LaFreniere were not in themselves *overtly* unlawful, they seem to us, in this context, to have been fully actionable under 18 U.S.C. § 1503.

A few simple illustrations may be useful. Purchasing a chisel at a hardware store is, usually, a lawful act, commonplace in the extreme. Yet, if an individual were to purchase the same chisel at the same hardware store with the avowed (evil) purpose that it be used as part of a planned break-in by persons in league with him, the iniquitous motive alone would transmogrify the innocent transaction into an overt act carrying undeniable criminal consequences. To step even closer to the case at bar, it is lawful—again, commonplace—to offer an acquaintance a lift to the airport. Nevertheless, if a person were to provide such transportation at precisely the same time and in precisely the same way, but with the corrupt purpose that the prospective passenger be spirited away so as to thwart his scheduled appearance before a grand jury, the impure motive alone would convert the otherwise-lawful gesture into an outright obstruction of the grand jury's mission—an obstruction which, most would concede, would be criminalized by § 1503.

That sort of alchemy—the conversion of innocent acts to guilty ones by the addition of improper intent—is what this case is all about. In the most fundamental sense, the "advice" given by Cintolo in the manipulation of his own client was a commodity no different than the chisel or the free ride. It was legal to traffic in the wares, but illegal corruptly to put them to felonious use. Nothing in the caselaw, fairly read, suggests that lawyers should be plucked gently from the madding crowd and sheltered from the rigors of 18 U.S.C. § 1503 in the manner urged by appellant and by the amici. Nor is there any sufficient public policy justification favoring such a result. To the contrary, the overriding policy interest is that "[t]he attorney-client relationship cannot ... be used to shield or promote illegitimate acts...." *United States v. Klubock*, No. 86–1413, slip op. at 11 n. 12 (1st Cir. March 25, 1987). "[A]ttorneys, just

---

7. The Second Circuit addressed this issue again in *United States v. Fayer*, 523 F.2d 661 (2d Cir. 1975). There, the defendant, an attorney representing targets of a grand jury investigation, advised a non-client witness who possessed damaging information not to testify before the grand jury. He claimed that he was merely offering the witness legal advice. The trial judge, sitting without a jury, found reasonable doubt as to the lawyer's motives in urging this course of action. *Id.* at 663. On that basis, he acquitted Fayer. But, the judge noted that "if the whole thing were set up to protect the [clients] rather than [the witness], I would have found [the attorney] guilty...." *Id.* On appeal, the Second Circuit held that it was constrained to affirm on account of the district court's findings of fact. *Id.* Nevertheless, the panel took pains to point out that advising a witness to plead the fifth amendment could violate § 1503 if done in whole or in part for an improper purpose. *Id.* In illustrating the sort of motive which it thought could support an obstruction charge in such a context, the court cut fairly close to the bone of contention before us, mentioning examples like "helping [clients] to cover up crimes to avoid indictment," *id.*, and "acting with knowledge of crimes committed, as opposed to giving innocent counsel." *Id.* at 664.

like all other persons, ... are not above the law and are subject to its full application under appropriate circumstances." *Id.* at 21 (citation omitted).

The authority upon which Cintolo relies for a contrary conclusion is readily distinguishable. In *United States v. Herron,* 28 F.2d 122 (N.D.Cal.1928), for example, the court reversed the conviction of an attorney who had advised a witness to plead his fifth amendment privilege, stating that it was not "the policy of the law to make criminal, no matter what the motive might have been, the advising a witness to do that which was lawful and *would in fact* have protected the witness from disclosing self-incriminating matter." *Id.* at 123 (emphasis original). We note, first, that the conclusion reached by the district court in *Herron* is a dubious one. *See, e.g., Cioffi,* 493 F.2d at 1119; *Cole,* 329 F.2d at 440, 443. Moreover, *Herron* distinguishes itself from the instant case because the lawyer-defendant advised a witness to invoke a right against compelled self-incrimination which the witness (irrespective of his actual guilt or innocence) in fact possessed. Cintolo, by contrast, helped press LaFreniere to invoke a supposed right which—as Cintolo well knew—was no longer LaFreniere's to claim. The distinction is obvious; it is predicated not upon the actual guilt or innocence of the recipients of the advice, but upon the divergent motives of the advisors. To urge another—whether guilty or not—to plead the fifth amendment because immunity has been withheld and because a reasonable fear of self-inculpation exists is one thing. It is quite another to advise a fully immunized client to claim fifth amendment rights which are no longer live, not because of any fear of self-inculpation, but for the sole purpose of shielding *other* individuals. Cintolo falls at the latter pole.

■ The remaining cases hawked by the appellant offer no sturdier support for his position. In *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975), for instance, the Court reversed the conviction of an attorney who had counseled his client not to respond to a subpoena duces tecum in a civil case, citing fifth amendment grounds. The Court noted, however, that the lawyer had acted "in the good-faith belief that if [his] client produced the materials he would run a substantial risk of self-incrimination." *Id.* at 455, 95 S.Ct. at 589. *See also id.* at 465–66, 95 S.Ct. at 594–95 ("The privilege against compelled self-incrimination would be drained of its meaning if counsel ... could be penalized for advising his client in good faith to assert it."). The Court quoted an earlier decision, *In re Watts,* 190 U.S. 1, 29, 23 S.Ct. 718, 725, 47 L.Ed. 933 (1903), to the effect that "if an attorney acts in good faith and in the honest belief that his advice is well founded and in the just interests of his client, he cannot be held liable for error in judgment." 419 U.S. at 467, 95 S.Ct. at 595. The clear implication of these comments is that, in the absence of a facially legitimate and bona fide basis for interposition of the fifth amendment, *i.e.,* in the absence of good faith on the lawyer's part, guilt may be predicated on the conduct. In our view, we are scrupulously faithful to *Maness* and to *Watts,* insofar as they have pertinence, when we lay stress on the evidence from which the jury could logically have inferred Cintolo's corrupt motive, want of good faith, and lack of any "honest belief" that LaFreniere had any residual right, after receiving immunity, to maintain his silence—or that doing so would benefit LaFreniere in any legally cognizable sense.

Appellant's reliance on *McNeal v. Hollowell,* 481 F.2d 1145 (5th Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1476, 39 L.Ed.2d 567 (1974), is likewise misplaced. The language of that decision undermines, rather than supports, the defense's reading of § 1503. In *McNeal,* the court acknowledged counsel's right to contact a codefendant to ensure that the latter knew of his constitutional rights before testifying against counsel's client. The court "start[ed] from the premise that an individual may not bribe, coerce, force, or threaten a witness to claim the privilege against self-incrimination," *id.* at 1152, and went on to observe that "[n]one of these forms of conduct has been even tangentially attrib-

uted to [defense] counsel." *Id.* What springs instantly to mind, of course, is that precisely the type of conduct which was not "even tangentially attributed" to the defense attorney in *McNeal* lies at the very heart of the government's case against Cintolo. We do not read *McNeal* as intimating in any way that a lawyer should receive kid-glove treatment under § 1503.

▮ There is yet another aspect to the pleas which we have heard, an aspect rooted more in policy than in the caselaw. Both appellant and the amici focus a portion of their arguments on the fact that Cintolo's representation of LaFreniere included many traditional lawyering functions—*e.g.*, the filing of motions, appearances in court, and the like—the potential criminalization of which under § 1503 could imperil the effectiveness of the defense bar. They point out, with some persuasive force, the dangers of permitting jurors to draw inferences from such "traditional" conduct as to the barrister's underlying motive. We need not enter this thicket today. Even if we were inclined to credit the surrealistic view that juries should *never* be permitted to draw inferences of corrupt intent solely from "traditional" attorney conduct performed in the course of representing a criminal defendant—and we are plainly not so inclined, *see supra*—this case would present no occasion for the implementation of such a rule. Here, as we have already noted, Cintolo's representation of LaFreniere was in no sense "traditional;" the evidence makes manifest that he acted less as an attorney for LaFreniere than as a minion of Angiulo. Indeed, the jury heard recorded conversations which revealed, from Cintolo's own mouth, that he was laboring mightily to get his ostensible client *into* jail, rather than to keep him out of it. Far from using the wonted tools of the lawyer's trade to ameliorate LaFreniere's legal position, the defendant helped Angiulo to place him in a vise and to turn the screw. An attorney who spurns the interests of his own client and conspires to subject him to a prison term for the benefit of a third party is not performing the traditional functions of defense counsel. Such an attorney is not, on any view of the matter, entitled to special perquisites and privileges.

▮ Whatever the contours of the line between traditional lawyering and corrupt intent may be, they must inevitably be drawn case-by-case. The question of whether an attorney who does no more than file motions, make court appearances, and the like—however dilatory they may seem, however much they may slow the progress of a grand jury probe—can ever be subject to § 1503 liability for such conduct alone, is not before us. We recognize the dangers that are present if prosecutors can be allowed to inquire into motive in such confined circumstances, and we respect the importance of allowing defense counsel to perform legitimate activities without let or hindrance. We do not see this case, however, edging into that forbidden terrain. Where, as here, it is proven beyond any reasonable doubt that a lawyer has purposefully acted as an advisor to third-party criminals and as a participant in the illegal plot which they have hatched, that he has served knowingly and willingly as a go-between linking the conspirators to his nominal client, that he has performed functions apart from (and alien to) the traditional chores of a lawyer, and that he has done all of this with the corrupt aim of frustrating a federal grand jury on its appointed rounds, then he cannot hide behind his law degree when the presence or absence of the essential elements of an obstruction of justice charge are considered. Having called the tune, Cintolo cannot be excused from paying the piper on the basis of his vocation.

When all is said and done, what separates the wheat from the chaff in this case is the plentitude of evidence developed at trial from which the jury could have concluded that Cintolo, with corrupt purpose, joined a powerfully coercive campaign to muzzle LaFreniere. In the last analysis, the jury did so conclude. That finding cannot lightly be overturned. Indeed, the record evidence preponderates strongly to the view that Cintolo's conduct, though nominally on behalf of his erstwhile client, was undertaken with the intent of protect-

ing Angiulo and Angiulo's associates, whatever the cost to LaFreniere and whatever the consequences to the due administration of justice. The fact that the client had to be encouraged to commit contempt and to serve a prison term was a routine expense of doing business—the "business" of safeguarding the interests of Angiulo and his henchmen. The jury was amply justified in determining that, vis-a-vis the due administration of justice, Cintolo acted *sterilissima infidelitas.* Seen in this gloomy light, the cases relied upon by appellant and the amici are inapposite, and the policies which they elucidate land wide of the mark.

 For the foregoing reasons, we emphatically reject the notion that a law degree, like some sorcerer's amulet, can ward off the rigors of the criminal law. No spells of this sort are cast by the acceptance of a defendant's retainer. We decline to chip some sort of special exception for lawyers into the brickwork of § 1503. By our reckoning, attorneys cannot be relieved of obligations of lawfulness imposed on the citizenry at large. Acceptable notions of evenhanded justice require that statutes like § 1503 apply to all persons, without preferment or favor. As sworn officers of the court, lawyers should not seek to avail themselves of relaxed rules of conduct. To the exact contrary, they should be held to the very highest standards in promoting the cause of justice. *See ABA Model Code of Professional Responsibility* EC 1–5 ("A lawyer should maintain high standards of professional conduct and should encourage fellow lawyers to do likewise."); EC 9–6 ("Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and judges thereof; ... to conduct himself so as to reflect credit on the legal profession and to inspire the confidence, respect, and trust of his clients and of the public").

We have carefully examined the avowed fears of the appellant and the amici that a decision upholding Cintolo's conviction in this case may deter counsel from multiple representation of defendants, or somehow chill the criminal defense bar in zealous advocacy on behalf of clients. We find such concerns to be grossly overstated. Our ruling today does not interfere with legitimate avenues of advocacy or the ethical conduct of even the most vigorous representation. We do nothing more than apply a criminal statute, aimed at protecting the sanctuary of justice from malevolent influences, in a sober and impartial fashion. Shorn of hyperbole, appellant's argument reduces to the thoroughly unsupportable claim that § 1503 has two levels of meaning—one (more permissive) for attorneys, one (more stringent) for other people. We see nothing to recommend the proposition that attorneys can be of easier virtue than the rest of society in terms of the criminal code. As citizens of the Republic equal under law, all must comply with the same statute in the same manner.

In sum, the government presented plethoric evidence from which the jury could reasonably have found the appellant guilty of conspiring to obstruct the due administration of justice. His role as a defense attorney did not insulate him from the criminal consequences of his corruptly-motivated actions. Accordingly, the district court did not err in denying the defendant's motion for judgment of acquittal.

### III.

Though the analysis contained in Part II, *supra,* disposes of the defendant's principal thesis, Cintolo has essayed a constitutional challenge to the omnibus clause of § 1503 as well. We have patiently considered the vagueness and overbreadth grounds which undergird this foray, and find them to be without merit. We discuss them briefly.

Given the absence of any first amendment considerations, the appellant cannot plausibly attack § 1503 as unconstitutionally vague on its face. *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975). Thus, we test the statute's clarity only as applied to the facts of this case. In *Robinson v. Berman,* 594 F.2d 1 (1st Cir.1979), we stated that a law "may not hold an individual 'criminally responsible for conduct which he could not reasonably understand to be proscribed.'"

*Id.* at 2 (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954)). *Accord United States v. Anzalone,* 766 F.2d 676, 678 (1st Cir.1985). So long as a criminal law is specific enough to give fair notice of what conduct is prohibited, *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972), and gives the challenger adequate warning that his contemplated conduct would be unlawful, *United States v. Mazurie,* 419 U.S. 544, 553, 95 S.Ct. 710, 715, 42 L.Ed.2d 706 (1975), the enactment passes constitutional muster.

The omnibus clause of § 1503, as we read it, easily satisfies these criteria. It is, indeed, aposematic—giving fair and conspicuous notice of what behavior it interdicts. Because other courts have dwelt on the subject at length, we need not reinvent the analytic wheel. *See, e.g., United States v. Howard,* 569 F.2d at 1336–37 ("Since the omnibus clause of the statute quite clearly proclaims that all obstructions of justice are prohibited, we conclude that section 1503 gives 'fair notice of the offending conduct' ..., which is all the constitution requires....") (citations omitted); *Anderson v. United States,* 215 F.2d 84, 90 (6th Cir.) (It is "perfectly apparent that no unconstitutional vagueness inheres" in § 1503), *cert. denied,* 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 698 (1954). Suffice it to say that we echo these sentiments.

On the record before us, there is no doubt that appellant in fact knew—or was chargeable with knowledge—that his conduct fell within the statute's proscriptions. To borrow an exceedingly apt phrase from the Fifth Circuit, "[i]f anyone unwittingly runs afoul of § 1503, it will not be on account of a misconstruction but because of an ignorance for which there is no excuse." *Howard,* 569 F.2d at 1336 n. 9. The law is, in our view, neither vague nor overbroad.

## IV.

Cintolo next espouses the notion that the trial court misjudged the relevancy *vel non* of certain items of proffered proof and/or impermissibly calibrated the relevan-cy/prejudice balance. Although this aspect of the appeal has many facets, none pave the way to reversal of the conviction. We believe that the district court acted within the bounds of its discretion in making its evidentiary rulings and we reject all of these assignments of error. Only four of them require any elaboration.

1. *The Order to Murder LaFreniere.* As mentioned earlier, the indictment charged that Cintolo participated in a conspiracy to obstruct the grand jury's investigation of Angiulo's gambling and loansharking enterprises. In the verbiage of the bill, a primary objective of the conspiracy was to ensure that LaFreniere did not "testify truthfully or otherwise cooperate with the investigation." The indictment described several overt acts purportedly undertaken to implement the conspiracy. Included among them was Angiulo's March 19, 1981 order to kill LaFreniere. According to the appellant, admission of evidence about this directive necessitates that his conviction be upset. We disagree.

The first contention which Cintolo addresses to this point is that Angiulo's homicidal command constituted inadmissible hearsay because the statement fell outside the scope—and was not in furtherance—of any conspiracy which Cintolo can be said to have joined. This argument relies principally on the trial judge's *Petrozziello* finding, *see United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977), to the effect that Cintolo neither knew in advance, nor at the time he joined the conspiracy, of Angiulo's edict. It is settled law, however, that one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of coconspirators, made after the formation and in furtherance of the conspiracy. *See United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed."). *See also United States v. United States Gypsum Co.,* 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948);

*United States v. Masse,* 816 F.2d 805, 810–11 (1st Cir.1987); *United States v. Sarno,* 456 F.2d 875, 878 (1st Cir.1972). As the Fifth Circuit observed in the analogous case of *United States v. Brasseaux,* 509 F.2d 157, 161 (5th Cir.1975), "once having entered into a common scheme with the other conspirators, appellant is bound by all acts committed by them in furtherance thereof, including those acts committed without his knowledge before he joined the conspiracy."

▆▆▆▆ In the case at bar, the jury could well have inferred that the execution order, issued at a time when Angiulo felt jittery and insecure, was part of the overall conspiracy which had as its explicit objective preventing LaFreniere from cooperating with the grand jury. Then, too, there was other evidence—including one recorded conversation in which Angiulo essentially confessed to Cintolo that he had ordered LaFreniere's murder—which tended to show that the appellant was aware that violent methods were being contemplated to ensure his "client's" silence. So, evidence of the death sentence was indisputably relevant in the Fed.R.Evid. 401 sense. *See United States v. Moreno Morales,* 815 F.2d 725, 739–40 (1st Cir.1987).[8]

▆▆▆▆ Yet, relevancy alone is not the ultimate test. The appellant argues that, even if marginally relevant, the probative value of the evidence was sufficiently outweighed by the risk of unfair prejudice that it should have been barred. As we have noted before, the trial judge has a front row seat which gives him a unique vantage point. "[He] is Johnny-on-the-spot; he has savored the full taste of the fray, and his considerable discretion [in conducting the balancing test required under Rule 403]

must be respected so long as he does not stray entirely beyond the pale." *United States v. Tierney,* 760 F.2d at 388. *See also Moreno Morales, supra; United States v. Marler,* 756 F.2d 206, 217 (1st Cir.1985); *United States v. Strahl,* 590 F.2d 10, 12 (1st Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979). Absent an abuse of discretion, a district court's determination of admissibility under Fed.R.Evid. 403 will not be disturbed on appeal. *United States v. Gonsalves,* 668 F.2d 73, 75 (1st Cir.), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982); *Dente v. Riddell, Inc.,* 664 F.2d 1, 5 (1st Cir.1981). The record before us establishes that the trial judge meticulously weighed probative value against the danger of unfair prejudice to the defendant before admitting evidence of the order to murder LaFreniere.[9] The court's conclusion that the worth of the evidence exceeded any authentic risk of confusing, misleading, or biasing the jury is a supportable one. In an instance such as this—where the evidence in question was highly relevant to establishing "the existence of the conspiracy and its particular workings", *United States v. Crocker,* 788 F.2d 802, 806–07 (1st Cir.1986), and "shed light on the conspirators' roles [and] method of operation ...," *id.* at 807—it would be folly for us to secondguess the district court. We will not do so.

The defendant's other arguments in favor of exclusion of this evidence are patently meritless. Discussion of them would serve no useful purpose. We therefore reject this prong of the appeal.

2. *The FBI's Warning to LaFreniere.* Cintolo assigns as error the district court's admission of testimony by two FBI agents

---

8. Angiulo's order was properly admissible into evidence on another theory as well, as a "verbal act" not offered for the truth of the matter asserted under Fed.R.Evid. 801(c). *See, e.g., Curreri v. International Brotherhood of Teamsters,* 722 F.2d 6, 11 (1st Cir.1983); *United States v. Ciampaglia,* 628 F.2d 632, 643 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). *See generally* McCormick, *Evidence* §§ 246, 249 (3d ed. 1984).

9. Judge Garrity conducted several hearings in which he assiduously reviewed a myriad of claims that particular evidence was unfairly prejudicial. The record in this case vis-a-vis the handling of delicate evidentiary questions stands as a model of thoroughness and care on the part of an experienced trial judge. His painstaking solicitude for the defendant's rights in this instance is further illustrated by his instructions to the jury that Cintolo had no prior knowledge of, and had not agreed to, the order to murder LaFreniere.

about the conversation in which they alerted LaFreniere to Angiulo's decision to eliminate him. Cintolo realleges that the testimony was inadmissible as hearsay and that its probative value was substantially overbalanced by its prejudicial effect. We find both contentions to be unconvincing.

With respect to the initial part of this incursion, the record bears out that the testimony of the FBI agents was not offered to prove the truth of the matters contained in their discussion with LaFreniere. Rather, the government tendered this testimony to establish that a conversation between LaFreniere and the agents had taken place during the early morning hours of March 20, 1981, a conversation which concerned a possible contract on LaFreniere's life. In the prosecution's view, it was suitable for the jury to hear this testimony not as evidence that what the agents told LaFreniere was true,[10] but to provide necessary background and context for understanding subsequent discourse amongst Angiulo and his cohorts regarding this very meeting.

 Although the trial judge gave no limiting instruction to confine the jury's consideration of the evidence to these matters, that is likely because the defendant never requested one. Having failed in this regard, Cintolo cannot now be heard to complain of any alleged omission on the part of the district court in this wise. See United States v. Coady, 809 F.2d 119, 123 & n. 3 (1st Cir.1987); Dirring v. United States, 328 F.2d at 515. Since evidence of the FBI agents' conversation with LaFreniere was not offered to prove the truth of the content thereof, such evidence did not constitute inadmissible hearsay, see Fed.R. Evid. 801(c), and the district court did not err in admitting it.

 Nor was the admission of the evidence unfairly prejudicial. The contrary argument merely restates the contentions which Cintolo has made—and which we have rejected—in protesting the admission of the execution order. See supra Part IV (1). So, we need not dwell on the point at any length. We must, however, deal with appellant's reliance on our decision in United States v. Mazza, 792 F.2d 1210 (1st Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987)—reliance which we find to be altogether misplaced.

In Mazza, we found that it was error to have admitted agents' testimony which reiterated statements made by a government informant concerning his dealings with the defendant. Id. at 1215.[11] Mazza, however, distinguishes itself in virtually every material respect. First, the probative value of the Mazza dialogue was negligible, see id. at 1216; as we have just explained, the relevance and force of the proof was much greater here. Next, whereas in Mazza, "the amount of out-of-court statement evidence was large ... [so] that the government effectively managed to have the jury hear a second-hand account of [the informer's] entire story through witnesses whose credibility the jury was less apt to question," id. at 1215 (emphasis original), the quantum of the agents' out-of-court statement evidence in this case was slight. The only statement which they repeated was Angiulo's order to commit the murder. In turn, this statement comprised a miniscule portion of the agents' testimony and an even smaller part of the electronic surveillance evidence as a whole. It beggars credulity to suggest that any such repetition could have enhanced the credibility of a tape recording.

10. To be sure, given that the jury listened to a recording of the actual conversation in which Angiulo ordered the killing, evidence presented for such a purpose might have been painting the lily. But, precisely because it was cumulative, any error in the admission of the agents' statements cannot fairly be said to have been harmful. See United States v. Mazza, 792 F.2d 1210, 1221–22 (1st Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987).

11. In Mazza, significantly, we found the mistake to have been harmless, 792 F.2d at 1221–22, primarily on account of the "overwhelming proof of guilt emanating from the properly admitted evidence, particularly the evidence on tape...." Id. at 1222. Given what we view as prolific evidence of Cintolo's participation in this conspiracy—evidence which is likewise documented by reliable recordings—any such error in this case would be similarly uninjurious.

We note, too, that the perception of unfair prejudice in *Mazza* rested in part on our fear that the agents' testimony "might have shown facts not later corroborated; [and] would also likely bolster the credibility of the informer ... before he took the stand." *Id.* at 1215. But here, the murder order had already been conclusively established by the tape recording—a piece of evidence that by its nature rendered corroboration immaterial—before the agents testified. *Mazza*, in short, was a horse of a decidedly different hue. Our decision therein lends no support to the contention that the admission of the FBI agents' testimony about their meeting with LaFreniere in this case constituted reversible error.

3. *Cintolo's Statement.* The next claim concerns the admission into evidence of certain extrajudicial remarks made by Cintolo during his dealings with Angiulo. The appellant charges that these particular comments were not legally relevant and that their (nonexistent) probative value was substantially outweighed by inherent prejudice. Fed.R.Evid. 401, 403. We do not agree.

The gist of these remarks amounted to a criminal scheme which involved the use of Cintolo's position as an attorney to shield Angiulo's allies from the Internal Revenue Service (IRS). It was on April 1, 1981 that the appellant volunteered an insight into his creative prowess. He brought to Angiulo's attention legal precedent to the effect that an attorney remitting tax payments to the IRS on behalf of a client could not be required to disclose the client's identity. Assuming that this supposed precedent would withstand scrutiny, Cintolo proposed a plan whereby the Angiulo organization, with Cintolo as the pivotman, could use this variation of the attorney-client privilege as a pick-and-roll to thwart future tax prosecutions. As the appellant noted:

> You can't be forced to divulge ... who the client is. Now, if you were to look at a situation that ten, fifteen guys might be in this situation, have them pool their money, send a check in—send one check in. Says, "I represent a client who underpaid his taxes six hundred dollars; here's the tax." And then a year later

something's going to come up with regards to one of these guys, O.K. He gets indicted ... taxes. Walk into court, say, "Yeah, that's my client. He's the one who paid this money."

Cintolo went on to explain what he envisioned as the beauty of the "gimmick": "they can't grab twenty guys; they're not going to indict twenty guys on taxes. But they grabbed one—he takes the benefit of the check."

 The relevancy objection need not detain us long. While we recognize that these comments bear no direct relation to the plot to silence LaFreniere, they reflect quite clearly on Cintolo's corrupt intentions. Notwithstanding general prohibitions regarding other crimes, wrongs, or acts, such evidence may be admitted for the purpose of showing motive, intent, knowledge, plan, or the like. Fed.R.Evid. 404(b). Given that Cintolo's motive and intent in consorting with Angiulo comprised perhaps the paramount issue in this case, we have little difficulty recognizing the legal relevance of the "tax dodge" evidence. As we have previously observed:

> Where ... the disputed evidence is offered to show motive, the relevancy hurdle is at its nadir. Motive is, by definition, subjective in nature; it is a state of mind that is shown by proving the emotion that brings it into being. Thus, as to such testimony, Professor Wigmore has observed that:
>
> > [A] circumstance showing the probability of appropriate ensuing action ... is always relevant....
>
> 1 Wigmore on Evidence § 118 at 558 (3d ed. 1940). As to such proof, relevancy objections have long been disfavored.

*United States v. Tierney*, 760 F.2d at 387.

In this instance, the district court cannot be said to have erred in categorizing the disputed evidence as relevant. And, once the Rule 401 judgment had been made, then—because of the latitude which the caselaw demands, *e.g.*, *supra* at 998 —we are unable to hold that the court abused its discretion in implementing the Rule 403 calculus.

4. *Nicolo's Statement.* The appellant, eschewing any hearsay objection, challenges

on relevancy grounds the admissibility of a comment addressed to Angiulo by his brother, Nicolo, on April 21, 1981. The remark was allowed against Cintolo as a coconspirator's statement made in furtherance of the plot. Fed.R.Evid. 801(d)(2)(E). Following the FBI's execution of search warrants at two locations where illicit Angiulo business had been conducted, Nicolo reported that the appellant had urged that material be placed in his (Cintolo's) briefcase in order to safeguard the items and frustrate the searchers.

█ Execution of the search warrants was designed to uncover evidence of illegal gambling activities run by targets of the pending grand jury investigation. Cintolo's suggestion, by fair implication an offer to commit the frankly criminal act of concealing incriminating evidence from the FBI, was relevant to proof of his corrupt intention in regard to the ongoing investigation. Cintolo's willingness to use his position as an attorney in a lawless way to protect Angiulo assuredly sheds a bright (if not flattering) light of relevancy on his motives, and would have been of obvious assistance to the factfinders in sizing up the appellant's performance during the later stages of the same investigation. Accordingly, admission of this out-of-court statement was germane to his knowledge, motive, and intent, *see* discussion *supra* Part IV(3), and it was not error under Fed.R.Evid. 404(b) to admit it. *Cf. United States v. Masse*, 816 F.2d at 813; *United States v. Kadouh*, 768 F.2d 20, 21–22 (1st Cir.1985).

## V.

Appellant's next assignment of error concerns the exclusion of some notes prepared by LaFreniere at Cintolo's instruction. Though LaFreniere did not testify at the trial, the notes were said by Cintolo to have represented LaFreniere's recollection of events which had transpired on March 9 and March 12, 1981, relative to his subpoena and appearance before the grand jury. When the defendant tried to introduce them into evidence, the district court excluded them as hearsay. Cintolo urges on appeal that the notes were admissible as nonhearsay evidence bearing on what is euphemistically described as LaFreniere's "fixed intention" not to testify, and concomitantly, on the defendant's state of mind whilst acting as LaFreniere's counsel.

█ Having examined these notes carefully, we are unable to locate any language therein which could reasonably be read as conveying—or even illuminating—such a mental state. The notes are nothing more than a factual recitation of events taking place incident to LaFreniere's first grand jury appearance. As such, they fail for this reason to qualify for the Fed.R.Evid. 803(3) exception to the hearsay rule. They fail for a second reason as well. Rule 803(3), by its express terms, pertains to "statement[s] of the *declarant's* then existing state of mind...." (emphasis added). But, these jottings are LaFreniere's notes of his own experiences and recollections, so they could not comprise evidence of *Cintolo's* state of mind, irrespective of their content. Either of these deficiencies, singly, would be difficult to overcome; the combined deficit leaves the proffer well out of bounds. As Justice Cardozo wrote in explaining the inadmissibility of evidence under the common law state of mind exception, LaFreniere's notes spoke not to then-existing state of mind, but "spoke to a past act, and more than that, to an act by some one not the speaker." *Shepard v. United States*, 290 U.S. 96, 106, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933). No error inhered in rejecting this proffer.[12]

## VI.

The last evidentiary ruling which warrants discussion touches upon a limitation

---

12. To the extent that the content of LaFreniere's notes might somehow be susceptible to a permissible inference regarding state of mind—and we can think of none—their probative value would be so exiguous as to be easily outweighed by the improper truth-of-the-matter use which the jury might be tempted to make of them. The nexus between the factual averments contained in the notes and the ostensible nonhearsay purpose (state of mind) was so tenuous that the district judge had plenty of room, as a matter of discretion, to exclude them on relevancy grounds. *See* Fed.R.Evid. 401, 403, 803(3).

of cross-examination. The district court refused to permit the defense to grill witnesses concerning the precise location of the electronic surveillance devices hidden in the Prince Street apartment. The government successfully objected to this line of questioning on the ground that the bruiting about of such information would jeopardize future criminal investigations.

We begin by noting that two sister circuits have recognized a qualified privilege against compelled government disclosure of sensitive investigative techniques. *See United States v. Van Horn*, 789 F.2d 1492, 1507–08 (11th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986); *United States v. Harley*, 682 F.2d 1018, 1020 (D.C.Cir.1982). The Eleventh Circuit applied the privilege specifically to the placement of electronic surveillance equipment:

> We hold that the privilege applies equally to the nature and location of electronic surveillance equipment. Disclosing the precise locations where surveillance devices are hidden or their precise specifications will educate criminals regarding how to protect themselves against police surveillance. Electronic surveillance is an important tool of law enforcement, and its effectiveness should not be unnecessarily compromised. Disclosure of such information will also educate persons on how to employ such techniques themselves, in violation of Title III.

*Van Horn*, 789 F.2d at 1508.

 Under Fed.R.Evid. 501, federal courts retain the power to develop common law witness privileges in criminal trials on a case-by-case basis. *See United States v. Gillock*, 445 U.S. 360, 367, 100 S.Ct. 1185, 1190, 63 L.Ed.2d 454 (1980); *Trammel v. United States*, 445 U.S. 40, 47–48, 100 S.Ct. 906, 910–11, 63 L.Ed.2d 186 (1980). Avail-

ing ourselves of this authority, we find the policy of qualified privilege to be entirely appropriate in the context of criminal trials where a defendant seeks disclosure of confidential government surveillance information.[13] We echo the concerns voiced by the Eleventh Circuit in *Van Horn* that discoverability of this kind of information will enable criminals to frustrate future government surveillance and perhaps unduly jeopardize the security of ongoing investigations. The potential price to be paid by law enforcement is heavy, and should not be assessed without good reason.

 Having found that such a privilege exists, we are quick to stress that it is a qualified one. It can be overcome by a sufficient showing of "need." *Van Horn*, 789 F.2d at 1508. The "necessity determination requires a case by case balancing process," *id.*, "controlled by 'the fundamental requirements of fairness.' " *Harley*, 682 F.2d at 1020 (quoting *Roviaro*, 353 U.S. at 60, 77 S.Ct. at 627). As the *Harley* court observed in analogous circumstances, "[a] defendant seeking to learn the location of a police surveillance post should ordinarily show that he needs the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point." 682 F.2d at 1020. Accordingly, our review of this ruling of the district court comes down to a determination of whether the appellant demonstrated an authentic "necessity," given the circumstances, to overbear the qualified privilege. In this instance, the scale tips decidedly in the prosecution's favor. Once the rhetorical gloss is rubbed off Cintolo's profession of need, very little is left: the claim comprises considerably more shine than substance.

The appellant urges that the information sought was essential to support his conten-

---

13. We see a persuasive parallel to this situation in what is commonly referred to as the "informer's privilege." The privilege is in reality the government's privilege to withhold the identity of persons who furnish information regarding violations of the law. "The purpose of the [informer's] privilege is the furtherance and protection of the public interest in effective law enforcement." *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). As Professor Wigmore observed, "[l]aw

enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship." 8 J. Wigmore, *Evidence* § 2374 (McNaughton rev. 1961). We find that parallel policy imperatives justify adoption of the qualified government privilege against disclosure of secret electronic surveillance information.

tion that "persons inside the apartment were not necessarily all involved in the same conversation or in a position to hear statements made by persons elsewhere in the room." A key to evaluating this claim of necessity, however, is the extent to which adequate alternative means could have substituted for the proffered testimony. *See Harley*, 682 F.2d at 1020. In this regard, the record reflects that the jury heard evidence regarding the size of the Prince Street apartment—evidence from which it could have concluded that not all persons present in the apartment necessarily heard every conversation (let alone, every word of every conversation). Moreover, the government's electronics expert conceded this possibility during cross-examination. *E.g.*, "It would depend entirely upon how big the room was, how loud they were talking and how far away he was...." Finally, the defense failed to demonstrate an absence of alternative methods of making its point. No claim was made that the premises were unavailable for inspection, or that information as to the floor plan was kept from defense witnesses. No expert vouched for the importance of the desired data. As to most of the critical dialogue, the defendant was a direct participant; thus, any contentiousness as to the scope of hearing range amounts to the reddest (and deadest) of herrings. Cintolo—who appeared as a witness on his own behalf—could have testified as to whether or not he participated in, or was within earshot of, particular conversations attributed to the conspirators. By and large, he elected not to do so. Absent this sort of foundation, it is difficult to see how more detailed inquiry into the location of the listening devices could have helped the defense.

In sum, the requisite showing of necessity was not achieved. Disclosure of the precise location of the surveillance equipment hidden in Angiulo's apartment, in the circumstances of this case, would have contributed no meaningful evidence to support appellant's defense. The district court was therefore justified in sustaining the government's claim of privilege. And in any event, undue tightfistedness in restricting the cross-examination on this narrow point—and we know of none—would have been benign beyond any reasonable doubt.

## VII.

The defendant has served up a salmagundi of contentions which relate to the charge to the jury. Some of these concern instructions which were requested but not given; others concern instructions which were given and which, it is claimed, were erroneous, incomplete, misleading, confusing, or some or all of the above. After painstaking examination of the relevant portions of the record and consideration of these points in their true context, we find the appellant's reports of harmful error to have been grossly exaggerated.

Close perscrutation of the charge itself makes it crystal clear that the district judge's instructions on the chief issues submitted to the jury—for example, the requirement that the government establish the existence of a criminal conspiracy beyond a reasonable doubt, that Cintolo's membership in the conspiracy be proved on the basis of his own words and actions (not on the basis of mere association or knowledge of wrongdoing), the liability of a conspirator for the acts of his coconspirators performed in furtherance of the conspiracy, and the necessity of finding that Cintolo had the specific intent both to join the conspiracy and corruptly to obstruct the due administration of justice—were uniformly correct statements of law. The definition which Judge Garrity employed of the key term—"corruptly"—came straight from the defendant's requests to charge.

■ The charge must, of course, be considered as a whole, not in isolated bits and pieces. *See Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"); *United States v. Lavoie*, 721 F.2d 407, 409 (1st Cir.1983) (similar), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1424, 79 L.Ed.2d 749 (1984); *United States v. Morris*, 700 F.2d 427, 433 (1st Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983) (similar). In this case, the jury instructions—viewed as an entire-

ty—were unexceptionable: accurate in content and fair in delivery.

 Much the same can be said in respect to the omitted instructions. Because the district court's charge adequately covered the subject matter of what the defense suggested (to the extent that the requests were proper and germane), no error can successfully be assigned to the "trial court's failure to use the precise language that defendant ... would have preferred." *Lavoie*, 721 F.2d at 409. *See also United States v. Fusaro*, 708 F.2d 17, 22 (1st Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983); *Morris*, 700 F.2d at 433.

As to the other omitted matters, we have screened them all. To launch into a blow-by-blow account would be an idle exercise. It is enough to note that some of the requests were superfluous, given what the court told the jury. Some plainly misstated the law, or distorted the facts, or both— and were rightly discarded. Some were marginal—arguably proper, arguably desirable. So long as the trial judge touches all the relevant bases, however, he has some discretion to pick and choose at the periphery. In this instance, that discretion appears to have been exercised sagaciously. To the extent that the omitted instructions were neither pleonastic nor unsuitable, it was within the court's discretion to elect not to include them in the charge in manner and form as presented.

We see no need to tarry overlong on these assertions of instructional error. None of them, whether viewed singly or in combination, impugned the fundamental

fairness of the trial or the soundness of the charge as rendered.[14] Cintolo's claims to the contrary are entirely without foundation.

## VIII.

 In summary, we hold that, on a dispassionate assessment of the record evidence and the reasonable inferences which could properly have been drawn therefrom, there was a satisfactory predicate to sustain the guilty verdict returned by the jury. We find that the various contentions which the appellant has loosed in an effort to upset his conviction are inadequate to the task. Cintolo's major points—the (in)sufficiency of the evidence, the admission of evidence over objection, the failure to permit him to introduce LaFreniere's notes or to cross-question the agents about the exact location of the surveillance devices, the integrity and completeness of the court's charge—have been addressed at some length, and must be rejected for the reasons which we have stated. The defendant's other arguments are so patently insubstantial as not to warrant extended discussion. All have been considered, and all are by this reference overruled.[15]

The thread which runs through Cintolo's pleas on appeal, of course, is his insistence that affirmance of his conviction under the circumstances here present will intimidate the defense bar. In the bargain, this thesis runs, a conviction will pose the gravest of threats to our adversary system of criminal justice, permitting the government not only to prosecute, but indeed to persecute, those who counsel criminal defendants not wisely but too well.

---

**14.** In some instances—for example, the lack of any instruction regarding a supposed "variance" between the indictment and the proof—Cintolo took no timely specific objection to the failure so to charge. Under Fed.R.Crim.P. 30, such omissions are fatal to his present claims. *See United States v. Coady*, 809 F.2d 119, 123 & n. 3 (1st Cir.1987); *United States v. Rollins*, 784 F.2d 35, 37 (1st Cir.1986); *Tierney*, 760 F.2d at 389–90. None of these instances, we hasten to add, involve what might by any stretch of the imagination be termed "plain error;" indeed, most do not involve error, whatever the adjectival accompaniment, at all.

**15.** We do comment specifically on one additional matter. The government, as part of a supple-

mental record appendix, furnished us with transcripts of the tape-recorded conversations at 98 Prince Street. We took under advisement the appellant's motion to strike the same, and now deny the motion. The transcripts, which were marked for identification at trial though not admitted as full exhibits, properly comprise a part of the record on appeal. *Cf. Bushkin Associates, Inc. v. Raytheon Co.*, 815 F.2d 142, 145 n. 2 (1st Cir.1987). Our substantive use of these transcriptions, however, is necessarily constrained by the same limitations which governed the jury's consideration of them. We acknowledge that they are but aids. Only the tapes—not the transcripts—constitute evidence; and "any differences between the two must be resolved in favor of what was heard on the

We do not see this case as sowing the seeds for such an horrific harvest. Cintolo did not merely defend an accused. The evidence demonstrated that he came upon an ongoing criminal enterprise, adopted it as his own, and willingly (sad to say, eagerly) participated in it. The facts of record are not pretty: they show with stark clarity a defendant who used his license to practice law as a means of assisting an ongoing criminal conspiracy, consciously and corruptly—just as, say, the driver of a getaway car might use his driver's license to a similar end. Under these grim circumstances, it would strike a far more deadly blow to the justice system were we to treat a defense lawyer's entry of appearance as an impenetrable suit of armor which shielded him from the consequences of his own voluntary acts, no matter how nefarious or corrupt.

*Affirmed.*

recording." *United States v. Carbone*, 798 F.2d 21, 26 (1st Cir.1986).