# United States Court of Appeals
## For the First Circuit

No. 06-2449

COMMONWEALTH OF PUERTO RICO,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA; ALBERTO R. GONZALES, Attorney General;
ROBERT MUELLER, Director of the FBI; ROSA EMILIA RODRIGUEZ-VÉLEZ,
U.S. Attorney for the District of Puerto Rico; and LUIS S.
FRATICELLI, Special Agent in Charge of the FBI in Puerto Rico,

Defendants, Appellees.

───────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, Chief U.S. District Judge]

───────────────

Before

Boudin, Chief Circuit Judge,

Lipez, Circuit Judge,

and Shadur,[*] Senior District Judge.

───────────────

Salvador J. Antonetti-Stutts, Solicitor General, with whom
Roberto J. Sánchez-Rámos, Secretary of Justice, Kenneth Pamias-
Velázquez, Special Aide to the Secretary of Justice, Jorge R. Roig-
Colón, Assistant Secretary of Justice, and Hiram A. Meléndez-
Juarbe, Legal Advisor to the Secretary of Justice, were on brief,
for appellant.
Mark B. Stern, Civil Division, Department of Justice, with
whom Peter D. Keisler, Assistant Attorney General, Rosa Emilia
Rodriguez-Vélez, U.S. Attorney, Jonathan F. Cohn, Deputy Assistant

───────────────

[*]Of the Northern District of Illinois, sitting by designation.

Attorney General, and <u>Alisa B. Klein</u>, Civil Division, Department of Justice, were on brief, for appellees.

June 15, 2007

**LIPEZ**, **Circuit Judge**.   This case presents a novel question: does the Commonwealth of Puerto Rico have a nonstatutory cause of action, grounded in its sovereign authority under the Constitution, to obtain information from the Federal Bureau of Investigation ("FBI") in connection with a criminal investigation into the activities of FBI employees?  We conclude that it does not.  Instead, under the circumstances of this case, Puerto Rico must pursue the information it seeks under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Further, in keeping with persuasive authority from other circuits, we hold that the FBI may assert a qualified privilege to protect sensitive law enforcement techniques and procedures from disclosure.  Having considered the application of that privilege in this case, we affirm the decision of the district court holding that the FBI did not err in withholding the requested information.

**I.**

This appeal involves two consolidated district court cases, Nos. 06-1306 and 06-1305,[1] arising from subpoenas for FBI records issued by the Puerto Rico Department of Justice ("PRDOJ").  The relevant facts are largely undisputed; where disputes exist, we

---

[1] The events in No. 06-1306 occurred before those in No. 06-1305, so we will discuss No. 06-1306 first despite its higher docket number.

note them but find that they are immaterial to our disposition of the case.

## A. Case No. 06-1306: Ojeda Subpoena

In the 1970s, Filiberto Ojeda Ríos helped found the Macheteros, an organization that advocates independence for Puerto Rico through armed struggle against the United States government. In 1983, the Macheteros stole $7.1 million from a bank in Connecticut. The FBI apprehended Ojeda in 1985, and, during his arrest, Ojeda shot an FBI agent in the face, permanently blinding the agent in one eye. Ojeda was acquitted for assaulting the agent following a trial in Puerto Rico. He then skipped bail while on trial for bank robbery and was sentenced in absentia in 1992. Fifteen years later, in September 2005, the FBI attempted to apprehend Ojeda at his residence in Hormigueros, Puerto Rico. During this intervention, Ojeda shot two FBI agents and was himself fatally wounded.

The PRDOJ commenced an investigation into the intervention. On October 4, 2005, a PRDOJ prosecutor issued a subpoena pursuant to title 34, section 1476 of the Puerto Rico Code commanding then United States Attorney Humberto Garcia to produce materials including: (1) a copy of the "Operation Order" (a document establishing the plan or rules of engagement for the FBI intervention at Ojeda's residence); (2) the name, rank, division, address, and telephone numbers of every person who participated in

-4-

or made decisions regarding the intervention, as well as an organizational diagram showing these individuals' rank on the line of command; (3) various equipment, including, but not limited to, all bullet-proof vests, helmets, weapons, and vehicles involved in the intervention; (4) any inventory of the property occupied during the intervention; (5) copies of any expert reports relating to the intervention or Ojeda's death; (6) copies of any audio or video recordings of the events relating to the intervention; (7) copies of all photographs relating to the intervention; and (8) copies of any relevant general FBI protocols, including those relating to violent interventions and potentially deadly force. In subsequent correspondence, the PRDOJ explained that the requests related to a "criminal investigation" that it was conducting into Ojeda's death.

By letter dated October 17, the FBI declined to produce the requested materials, explaining that its internal regulations prohibited disclosure of records compiled for law enforcement purposes. The letter stated that the denial of the PRDOJ's request was a "final agency decision which may be reviewed by the United States District Court."

After further communications among the PRDOJ, FBI, and United States Attorney's Office, the U.S. Attorney indicated by letter dated November 9 that the FBI would allow the PRDOJ to examine some of the items listed in the subpoena, including the bulletproof vests, helmets, weapons, and vehicles used during the

-5-

intervention and the photographs taken before, during, and after the intervention. The FBI stipulated that it would retain official custody of these items and that an FBI official would be present during the inspection.

The PRDOJ initially acceded to these terms, but subsequently reiterated the substance of its original demand in a letter dated January 20, 2006. The FBI refused this demand, again noting that its refusal constituted "final agency action." The PRDOJ filed suit in March 2006 to compel disclosure of the requested materials.

**B. Case No. 06-1305: 444 de Diego Subpoena**

Using information obtained from Ojeda's residence to establish probable cause, the FBI obtained a search warrant for a residential condominium located at 444 de Diego in San Juan, Puerto Rico. The FBI executed the warrant in February 2006, and a large group of protesters, reporters, and members of the general public gathered outside. The United States asserts that some of these individuals breached an established police line, and an FBI agent used pepper spray to keep people behind the line.

The PRDOJ issued subpoenas to U.S. Attorney Garcia and to Luis Fraticelli, Special Agent in Charge of the FBI San Juan Field Office, requesting three categories of materials: (1) the name, rank, division, address, and telephone number of the two FBI agents who allegedly used pepper spray and whose photos were attached to

the subpoena; (2) official photographs of these two FBI agents; and (3) internal FBI protocols relating to the use of force and pepper spray. The PRDOJ explained that the subpoenas were "part of the criminal investigation" of the PRDOJ into "the conduct of FBI agents during the execution of a search warrant" at 444 de Diego.

The FBI moved to quash the subpoenas in federal district court. After the PRDOJ indicated, at a hearing on March 2, that "it was actually evaluating other avenues through which to get the information about the federal agents, and that it had no serious intention of enforcing the challenged subpoenas," the district court concluded that the subpoenas were "effectively mooted." The court thus withheld action on the motion to quash. Subsequently, on March 23, the PRDOJ filed suit to compel the release of the requested records.

## C. Proceedings Before the District Court

Puerto Rico's complaint in No. 06-1306 sought a declaratory judgment recognizing its right "to conduct a full investigation into the events leading to the death of Mr. Ojeda Rios," and an order "permanently enjoining Defendants from withholding any information relevant to the Commonwealth's investigation and ordering Defendants to comply with the Commonwealth's requests and produce the subpoenaed information, objects and documents[.]" The complaint in No. 06-1305 sought identical relief with respect to Puerto Rico's "investigation into

-7-

the events allegedly leading to the injury of members of the press and/or the public . . . on February 10, 2006, due to the alleged use of excessive force (including the alleged use of pepper spray) by FBI agents[.]"

In each complaint, Puerto Rico articulated five causes of action which entitled it to its requested relief. First, it stated that the FBI's decisions were not premised upon any federal regulation or statute. Second, it stated that the FBI's decisions exceeded any authority granted by the Housekeeping Act, 5 U.S.C. § 301. Third, it asserted a nonstatutory cause of action to vindicate its constitutional sovereign authority to enforce its criminal laws by obtaining the requested information. Fourth, it contended that APA review was "unwarranted" because such review "would impose an undue burden on the exercise of sovereign criminal authority that would run afoul of the Tenth Amendment." Finally, Puerto Rico claimed that, even if reviewed under the APA, the FBI's decision to withhold the information was arbitrary, capricious, and an abuse of discretion.

The district court consolidated the cases, the United States moved to dismiss, and Puerto Rico filed a motion for summary judgment. After considering these motions, the district court concluded that Puerto Rico had failed to establish a basis for its requested relief. The court rejected Puerto Rico's first two causes of action, explaining that, although the FBI's internal

regulations did not create a substantive right to withhold the information, the regulations incorporated federal common law establishing a privilege for law enforcement materials. The court also dismissed Puerto Rico's third cause of action, holding that Puerto Rico could not assert a nonstatutory cause of action, based on its sovereign right to enforce its criminal laws, to obtain the requested materials. The court thus concluded that Puerto Rico's request was subject to judicial review under the provisions of the APA, thereby rejecting Puerto Rico's fourth cause of action. Finally, on Puerto Rico's fifth and final cause of action, the court applied the APA's framework for review. Noting the FBI's interest in maintaining the confidentiality of sensitive law enforcement techniques, it found that the FBI's decision with respect to the Ojeda subpoena was neither arbitrary nor capricious. With respect to the 444 de Diego subpoena, the court concluded that there had been no final agency action, and thus the FBI's failure to release the information was not subject to judicial review. In sum, the court dismissed Puerto Rico's first through fourth causes of action, and, on the fifth cause of action, denied Puerto Rico's motion for summary judgment and granted summary judgment to the United States.

This appeal ensued.

On appeal, Puerto Rico first contends that its sovereign right to enforce its criminal laws provides it with a nonstatutory cause of action to obtain the information it seeks from the FBI. It explains that, under our federal constitutional system, a state has a "judicially cognizable interest in the preservation of [its] own sovereignty," which includes its "ability to punish wrongdoers and enforce its criminal laws" and, more specifically, "to prosecute federal agents if they have acted unlawfully in carrying out their duties."[2] Consequently, "any impermissible federal interference with such constitutional sovereignty is amenable to resolution by a federal district court under its equitable powers." Puerto Rico concludes that "[a] direct cause of action for equitable relief is the only avenue to properly vindicate a State's constitutional claim of sovereign[] authority to enforce its criminal laws."

Although Puerto Rico acknowledges that agency decisions are normally reviewed under the APA, it argues that such review is inappropriate because: (1) "[i]t is unfounded to subject a State's sovereign penal authority to an administrative process that will be followed by an extremely limited form of judicial review"; (2) such review will place Puerto Rico "in a worse position to obtain

---

[2] The parties agree that Puerto Rico is situated identically to a state for purposes of this appeal.

information than private parties" who can sue the federal government and request discovery under Federal Rule of Civil Procedure 26; and (3) APA review would allow the federal government to "commandeer[] state prosecutorial powers by deciding what information the State should consider in its investigations."[3]

As in all suits against the federal government, we must first consider whether sovereign immunity bars this claim. "It is long settled law that, as an attribute of sovereign immunity, the United States and its agencies may not be subject to judicial proceedings unless there has been an express waiver of that immunity." EPA v. Gen. Elec. Co., 197 F.3d 592, 597 (2d Cir. 1999). The APA waives sovereign immunity under certain conditions:

> A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it

---

[3] With respect to the "commandeering" issue, Puerto Rico does not develop its argument other than to cite to New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 521 U.S. 898 (1997), which established that the federal government may not "commandeer" state governments by compelling state officials to enact or administer a federal regulatory program. In light of the lack of developed argumentation, we find it unnecessary to address this claim. See Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 734 (1st Cir. 1990)(explaining that issues "adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned").

> is against the United States or that the
> United States is an indispensable party.

5 U.S.C. § 702.[4]  This waiver is for "'all equitable actions for specific relief against a Federal agency or officer acting in an official capacity,'" Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 186 (D.C. Cir. 2006)(quoting Sea-Land Serv., Inc., v. Alaska R.R., 659 F.2d 243, 244 (D.C. Cir. 1981)), and thus "'applies to any suit whether under the APA or not.'"  Id. at 186 (D.C. Cir. 2006)(quoting Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)); see also Hostetter v. United States, 739 F.2d 983, 985 (4th Cir. 1984)("In section 702 Congress has waived the defense of sovereign immunity in such nonstatutory review cases in which nonmonetary relief is sought . . . ."); Jaffee v. United States, 592 F.2d 712, 719 (3d Cir. 1979)("By waiving sovereign immunity in suits for 'relief other than money damages,' the Congress sought to 'facilitate nonstatutory judicial review of Federal administrative action . . . .'" (citation omitted)).

Although this persuasive authority indicates that sovereign immunity would pose no bar to Puerto Rico's claim for nonmonetary relief, the question remains whether Puerto Rico has the nonstatutory cause of action it invokes.  In prior cases

_____

[4] At least one court has held that a state qualifies as a "person" within the meaning of the APA, see Md. Dep't of Human Res. v. Dep't of Health & Human Servs., 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985), and the government does not argue otherwise here.

-12-

involving subpoenas issued by state entities, courts have held that the party requesting the subpoena must proceed under the APA. Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency, 86 F.3d 1208, 1212 (D.C. Cir. 1996)("[A] state-court litigant must request the documents from the federal agency pursuant to the agency's regulations . . . . If the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA."); Edwards v. U.S. Dep't of Justice, 43 F.3d 312, 316 (7th Cir. 1994)("The subpoenas were in effect a request for information from an executive department . . . . The subpoena is treated as an administrative demand." (citations omitted)).

Puerto Rico asserts, however, that its suit is an exception to this principle due to its constitutionally-based sovereign authority to enforce its criminal laws. It is uncontroverted that states may enact and enforce criminal laws, and that this power is constitutional in nature. As the Supreme Court explained in Heath v. Alabama, 474 U.S. 82 (1985), "[t]he Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.' Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code." Id. at 93 (quoting Federalist No. 9); see also Engle v. Isaac, 456 U.S. 107, 128 (1982)("The States possess primary authority for defining and enforcing the

-13-

criminal law. . . . Federal intrusions into state criminal trials frustrate . . . the States' sovereign power to punish offenders . . . .").

When a party claims that a violation of its constitutional rights has occurred and it has "no effective means other than the judiciary to enforce these rights, [that party] must be able to invoke the existing jurisdiction of the courts for the protection of [its] justiciable constitutional rights." Davis v. Passman, 442 U.S. 228, 242 (1979); see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971)(holding that a "cause of action for damages" arises under the Constitution when federal officers violate Fourth Amendment rights). Where, as here, a state has asserted a right that is constitutional in nature, "we are bound by a strong presumption in favor of providing the state some vehicle for vindicating its rights." R.I. Dep't of Envtl. Mgmt. v. United States ("RIDEM"), 304 F.3d 31, 41 (1st Cir. 2002).

In the context of agency action, parties occasionally invoke the principles of "nonstatutory review." Nonstatutory review is available pursuant to the general "federal question" jurisdiction of the federal courts under 28 U.S.C. § 1331 in situations where "Congress makes no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is taken, or in another statute applicable

to it." <u>Five Flags Pipe Line Co.</u> v. <u>Dep't of Transp.</u>, 854 F.2d 1438, 1439 (D.C. Cir. 1988). "The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is <u>ultra vires</u>." <u>RIDEM</u>, 304 F.3d at 42. Thus, if "a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." <u>Reich</u>, 74 F.3d at 1327 (citing Clark Byse & Joseph V. Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L. Rev. 308, 321 (1967)). Puerto Rico claims that the FBI acted outside the scope of its legal authority in withholding the requested materials, in violation of the Constitution, and that the Constitution itself provides a basis for nonstatutory review of that violation.

In <u>RIDEM</u>, we evaluated a similar claim for nonstatutory review that was "constitutional in scope." 304 F.3d at 41. There, the state of Rhode Island brought suit to assert that its sovereign immunity (a "constitutionally protected sovereign interest") entitled it to enjoin an administrative proceeding that the Department of Labor had initiated against it. <u>Id.</u> at 36. We noted that the Supreme Court has established two "critical factors [that] must be present to invoke nonstatutory review." <u>RIDEM</u>, 304 F.3d at 42. First, such review may occur only if its absence would

"'wholly deprive the party of a meaningful and adequate means of vindicating its . . . rights.'" Id. (quoting Bd. of Gov'rs of Fed. Reserve Sys. v. McCorp. Fin., 502 U.S. 32, 43 (1991)). Second, "Congress must not have clearly intended to preclude review of the agency's particular determination." Id. at 42-43 (citing Bd. of Gov'rs, 502 U.S. at 44). We then applied these two factors and concluded that Rhode Island had a direct, nonstatutory cause of action to enjoin an administrative proceeding on the ground of sovereign immunity, even though the APA requires that parties exhaust their administrative remedies before seeking judicial review. Id. at 43. We explained that Rhode Island had no other avenue for vindicating its right to immunity from suit and that Congress had not explicitly precluded its action. Id. Moreover, we emphasized that "general equitable considerations" favored a nonstatutory action, including the fact that Rhode Island had claimed the violation of "a clear right that is constitutional in nature" and that its "immunity would be effectively lost absent judicial review." Id.

Puerto Rico's situation differs materially from that of Rhode Island in RIDEM. Critically, with respect to the first requirement for nonstatutory review, Puerto Rico does have a means of vindicating its rights without nonstatutory review: the APA.[5]

---

[5] Although RIDEM is the only case the parties have cited that involves a sovereign entity attempting to assert its constitutionally-based sovereign prerogatives, other cases support

-16-

Within that judicial review framework, Puerto Rico may assert its sovereign interest in enforcing its criminal laws as a consideration in our review of the agency's decision. Thus, we cannot conclude that Puerto Rico's rights "would be effectively lost absent judicial review." Id. at 43 (citing Morales v. Trans World Airlines, 504 U.S. 374, 381 (1992)). Likewise, with respect to the second requirement, although Congress has not explicitly prohibited nonstatutory review in a case such as this, the existence of the APA as a means for reviewing the FBI's actions at least implies that nonstatutory review is inappropriate.

We recognize that nonstatutory review might have allowed Puerto Rico to obtain a more favorable standard of review and to circumvent certain of the APA's procedural requirements. However, in considering Puerto Rico's demand for a more favorable standard of judicial review on constitutional grounds, we must be mindful of

the notion that the absence of another avenue for the parties to vindicate their rights is a necessary condition for nonstatutory review. For example, in Leedom v. Kyne, 358 U.S. 184, 190-91 (1958), the Court held that the president of a union had a nonstatutory cause of action to file suit against the National Labor Relations Board to set aside the NLRB's certification, in violation of 29 U.S.C. § 159(b)(1), of a bargaining unit including both professional and nonprofessional employees. The Court explained that a critical factor in allowing the union president to bring suit despite the lack of explicit statutory authorization was that "'absence of jurisdiction of the federal courts' would mean 'a sacrifice or obliteration of a right which Congress' has given professional employees, for there is no other means, within their control to protect and enforce that right." Id. at 190 (quoting Switchmen's Union of N. Am. v. Nat'l Mediation Bd., 320 U.S. 297, 300 (1943)).

the Supremacy Clause, which "is designed to ensure that states do not 'retard, impede, burden, or in any manner control' the execution of federal law." New York v. Tanella, 374 F.3d 141, 147 (2d Cir. 2004)(quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436 (1819)). We are not suggesting that the Supremacy Clause alone provides the basis for rejecting Puerto Rico's theory of a nonstatutory cause of action to obtain law enforcement information from the FBI. But Puerto Rico portrays its sovereign authority over law enforcement as paramount in the analysis. That cannot be so. The Supremacy Clause reminds us that the federal government also has a critical interest in carrying out its own law enforcement responsibilities. In most instances, federal and state law enforcement interests are complementary. However, when a state's interest in investigating the agents of a federal law enforcement entity arguably conflicts with that federal entity's need to protect certain information relating to law enforcement activities, Congress has provided a mechanism — the APA — for resolving these conflicts. Puerto Rico has not convinced us that this congressional choice was somehow constitutionally insufficient and hence Puerto Rico must have a nonstatutory cause of action to vindicate its law enforcement interests. To the contrary, for the reasons we have expressed, we conclude that the judicial review provided by the APA for the denial of information by a federal agency is compatible with Puerto Rico's sovereign authority under

-18-

the Constitution for the enforcement of its criminal laws.

## III.

Under the APA, we will overturn the FBI's decision not to release the requested information only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The fact that Puerto Rico made its request for information in the form of a subpoena from the PRDOJ does not affect the nature of our review under the APA. The subpoenas were "in effect a request for information from an executive department," and, consequently, "the subpoena[s] are treated as an administrative demand." Edwards v. U.S. Dep't of Justice, 43 F.3d 312, 316 (7th Cir. 1994)(explaining that a subpoena initiates the administrative process); see also 28 U.S.C. § 16.21.[6]

---

[6] We note that, where a subpoena is issued to a non-party federal government agency in conjunction with litigation in state court, the state court may not enforce the subpoena against the federal government due to federal sovereign immunity, and the federal courts have consistently held that they lack jurisdiction to enforce the subpoena in cases where the government has removed the subpoena proceedings to federal court. See Smith v. Cromer, 159 F.3d 875, 879 (4th Cir. 1998); Houston Bus. Journal, 86 F.3d at 1211-12; Louisiana v. Sparks, 978 F.2d 226, 235 (5th Cir. 1992). Instead, courts have explained that, to obtain federal judicial review of a federal agency's refusal to release information, "a state-court litigant must request the documents from the federal agency pursuant to the agency's regulations," and that if "the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA." Houston Bus. Journal, 86 F.3d at 1212. Here, of course, the subpoena was not issued pursuant to any underlying litigation. However, the same principle — that a party

In applying the arbitrary and capricious standard of review, we are deferential to the agency's decision. In general, an agency's "choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources." COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 278 (4th Cir. 1999). We review de novo the decision of the district court because that court, "'limited to the administrative record, is in no better position to review the agency than the court of appeals.'" Edwards, 43 F.3d at 314 (quoting Asarco, Inc. v. U.S. Envtl. Prot. Agency, 616 F.2d 1153, 1161 (9th Cir. 1980)).

In evaluating the FBI's decision, we take into account both that agency's internal regulations governing the release of material and the substantive law governing the law enforcement privilege.

## A. Regulations

Under the Housekeeping Act, 5 U.S.C. § 301, federal agencies may promulgate regulations establishing conditions for the disclosure of information. The Supreme Court upheld the validity of such regulations in United States ex rel. Touhy v. Ragen, 340 U.S. 462, 468 (1951), explaining that it is appropriate for the head of an agency "to prescribe regulations not inconsistent with

wishing to obtain information from the federal government must file a request pursuant to the agency's regulations, and may seek judicial review only under the APA — applies in the present case as well.

-20-

law for 'the custody, use, and preservation of the records, papers, and property appertaining to'" the agency's business.  Within the administrative review process, "[t]he regulations 'provide guidance for the internal operations of the [agency],'" but do not create a substantive defense to disclosure.  Kwan Fai Mak v. FBI, 252 F.3d 1089, 1092 (9th Cir. 2001)(quoting 28 C.F.R. § 16.21(d)).  In other words, "the regulations do not 'create an independent privilege' authorizing the Department of Justice to withhold information." Id. (quoting Exxon Shipping Co. v. U.S. Dep't of Interior, 34 F.3d 774, 780 (9th Cir. 1994)).  Rather, they "simply set forth administrative procedures to be followed when demands for information are received."  Id.

Here, pursuant to the Housekeeping Act, the FBI has promulgated regulations explaining that, in deciding whether to release information, its officials should consider "[w]hether disclosure is appropriate under the rules of procedure governing the case" and "[w]hether [the] disclosure is appropriate under the relevant substantive law concerning privilege."  28 C.F.R. § 16.26(a)(1), (2).  Situations in which disclosure will not be made include those where "[d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."  Id. § 16.26(b)(5).

-21-

As we have explained, the Touhy regulations are only procedural, and do not create a substantive entitlement to withhold information. Thus, the FBI's compliance with the regulations cannot be a sufficient justification for withholding requested materials. Instead, our review of the reasonableness of the agency's decision focuses on the substantive law concerning privilege, to which we now turn.

**B. Law Enforcement Privilege**

The Supreme Court first recognized a qualified privilege for certain information related to law enforcement activities in Roviaro v. United States, 353 U.S. 53 (1957). There, the Court explained that the government has a qualified privilege to withhold the identities of confidential informants. Id. at 59. Such a privilege "further[s] and protect[s] [ ] the public interest in effective law enforcement," encouraging citizens to communicate their knowledge of crimes by preserving their anonymity. Id. The Court also noted that "[t]he scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged." Id. at 60.

Since Roviaro, we have recognized a privilege for law enforcement materials in other circumstances. In United States v. Cintolo, 818 F.2d 980, 983-84 (1st Cir. 1987), the FBI, with judicial authorization, had monitored conversations between the

-22-

defendant and various confederates via hidden microphones placed within an apartment. The district court refused to allow the defense to question witnesses "concerning the precise location of the electronic surveillance devices" on the ground that such questioning would "jeopardize future criminal investigations." Id. at 1002. In upholding the district court's decision, we first noted that other circuits had found that the privilege could cover "sensitive investigative techniques." Id. We then recognized a qualified privilege for the "disclosure of confidential government surveillance information," explaining that "discoverability of this kind of information will enable criminals to frustrate future government surveillance and perhaps unduly jeopardize the security of ongoing investigations." Id. We emphasized that the privilege could be overcome by a sufficient showing of need, and thus concluded that courts must determine on a case-by-case basis whether a party has "demonstrated an authentic 'necessity,' given the circumstances, to overbear the qualified privilege." Id.

Other circuits have explicitly acknowledged a broader privilege for law enforcement materials. The D.C. Circuit has explained that the privilege for investigatory materials is "rooted in common sense as well as common law," noting that "law enforcement operations cannot be effective if conducted in full public view" and that the public has an interest in "minimizing disclosure of documents that would tend to reveal law enforcement

investigative techniques or sources." Black v. Sheraton Corp. of Am., 564 F.2d 531, 542, 545 (D.C. Cir. 1977). Similarly, in In re Department of Investigation of the City of New York, 856 F.2d 481 (2d Cir. 1988), the Second Circuit explained:

> [T]he law enforcement privilege [ ] has been recognized in the absence of a statutory foundation, and [ ] is largely incorporated into the various state and federal freedom of information acts. The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

Id. at 483-84 (citations and footnotes omitted); see also United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995)(citing In re Dep't of Investigation). Most recently, the Fifth Circuit acknowledged "the existence of a law enforcement privilege beyond that allowed for identities of confidential informants" in a case involving documents containing "information about ongoing criminal investigations — including investigative leads, law enforcement methods and techniques, internal investigative memoranda, and identifying information relating to witnesses and law enforcement personnel, including undercover operatives." In re U.S. Dep't of Homeland Sec., 459 F.3d 565, 569, 568 (5th Cir. 2006). The court remanded for the district court to make an in camera determination regarding the privilege, noting that the rationale for such a

-24-

privilege is "even more compelling now" because "in today's times the compelled production of government documents could impact highly sensitive matters relating to national security." Id. at 569.

Although Puerto Rico has not made a request for information under the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552,[7] the provisions of this statute also provide guidance in determining the appropriate scope of the privilege. The law enforcement exemption to FOIA shields from disclosure documents whose production would, inter alia, "interfere with enforcement proceedings" or "endanger the life or physical safety of any individual." Id. § 552(b)(7); see also Ctr. for Nat'l Sec. Studies v. U.S. Dep't. of Justice, 331 F.3d 918, 925-26 (D.C. Cir. 2003)(explaining that, in enacting 5 U.S.C. § 552(b)(7)(A) "'Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations'" (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 232 (1978))).

Puerto Rico argues that the law enforcement privilege, whatever its source and scope, must yield to a state's sovereign authority to investigate violations of its criminal laws. However,

---

[7] The United States notes this omission but also acknowledged at oral argument that FOIA would not be an appropriate vehicle for all of the materials that Puerto Rico sought in its subpoena.

it cites no case supporting such a sweeping proposition.[8]  But the absence of such authority does not minimize the legitimate interests of Puerto Rico in securing information relevant to its criminal investigations.  The important questions are how far the law enforcement privilege should extend and how, in the face of Puerto Rico's demand for information, the privilege should be applied in this case.

Given the persuasive authority from other circuits, the law enforcement exemption set forth in FOIA, and "the public interest in effective law enforcement," Roviaro, 353 U.S. at 59, we deem it appropriate to extend the privilege we previously recognized for "confidential government surveillance information," Cintolo, 818 F.2d at 1002, to "law enforcement techniques and procedures," In re Dep't of Investigation, 856 F.2d at 484.[9]

---

[8]  Puerto Rico offers one circuit court case involving an "intergovernmental privilege dispute" and suggests that the privilege is less compelling in such a situation.  In United States v. O'Neill, 619 F.2d 222 (3d Cir. 1980), the United States had moved to enforce a subpoena duces tecum against the Philadelphia Police Department.  Although the court did comment that "[t]here is an anomaly in the assertion of a public interest 'privilege' by the City to justify withholding information from a federal Commission charged by Congress to investigate in the public interest the possible denial of equal protection by, inter alia, local government units," id. at 230, its decision focused primarily on the fact that the Police Department had not properly asserted the privilege and emphasized the lack of Supreme Court precedent supporting a "broad amorphous Government privilege" to protect "material relating to ongoing civil and criminal investigations," id. at 229.

[9]  Under Federal Rule of Evidence 501, federal courts retain the power to develop common law privileges on a case-by-case basis.

Indeed, the justification we cited in <u>Cintolo</u> — that disclosing the location of surveillance information would jeopardize future surveillance operations — applies similarly to the information about techniques and protocols that Puerto Rico has requested here. Their disclosure would also jeopardize future criminal investigations. We emphasize that this qualified privilege is subject to balancing the federal government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure.[10] That balancing must be done with particular care in situations, such as this one, involving conflicts between the federal and state governments.

Having recognized, in principle, a qualified privilege for law enforcement techniques and procedures, we turn now to the task of evaluating under the APA the FBI's response to the specific information requests of Puerto Rico.

---

See <u>United States</u> v. <u>Gillock</u>, 445 U.S. 360, 367 (1980).

[10] Certain procedures, such as in camera review of the requested materials and particularized assertion of the relevant interests, may aid in a court's assessment of these interests. We will discuss the applicability of such procedures in this case <u>infra</u> at Section IV.A.

## A. Procedural Challenges

Before we address the substance of the FBI's decision not to disclose the requested materials, we must resolve an array of procedural objections that Puerto Rico has raised to the assertion of privilege in the proceedings below. Puerto Rico first complains that the privilege was not properly invoked because the FBI did not submit an affidavit from the head of the agency, the district court did not perform an in camera review of the materials that were the subject of the subpoena, and the assertion of privilege was not accompanied by the FBI's item-by-item balancing of the harm to federal law enforcement interests and the necessity of the materials to Puerto Rico's investigation. The United States responds that Puerto Rico did not raise these objections in the district court and therefore has waived them.

Before the district court, Puerto Rico stated, in its opposition to the United States' motion to dismiss, that "Defendants' failure to properly assert, at the time they decided not to disclose, the list of privileges that they now pretend to raise constitutes a waiver of all such privileges." In other words, Puerto Rico insisted that the United States could not offer reasons to the district court for withholding the information that it had not given to Puerto Rico when it denied the Commonwealth's demand for information. In its motion for summary judgment, Puerto

Rico further contended that the decision not to release the materials was arbitrary and capricious

> because it is premised exclusively on a regulation that does not create a privilege. Defendants' wholly conclusory assertion that disclosure of the information is not warranted under the regulations simply lacks any valid explanation for the denial. Defendants did not assert a substantive privilege for the Court to consider, or even offer a valid explanation for the refusal to disclose. Defendants did not even purport to substantiate or justify their denial with an analysis of the pertinent factors.

Puerto Rico did not, however, identify for the district court's consideration the specific procedures it now requests: an affidavit from the head of the FBI, an in camera review of the materials, and an item-by-item balancing of the interests at stake in disclosure of the materials.

We must also consider the manner in which the United States asserted the privilege. In its October 17, 2005 letter denying the request for information with respect to the Ojeda subpoena, the FBI explained that "[a] determination has been made not to disclose any of the information, objects and documents requested by the PRDOJ" because such disclosure "would involve the conditions enumerated in [28 U.S.C.] § 16.26(b)(5)."[11] With respect

---

[11] As noted, 28 U.S.C. § 16.26(b)(5) states that disclosure will not be made when it "would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."

to the 444 de Diego subpoena, the United States' motion to quash explained that disclosure of the internal protocols "would reveal investigative and enforcement techniques" and that disclosure of the identities and official photographs of the FBI agents would violate their privacy rights and "pose a serious security threat."

After Puerto Rico filed its complaint, the United States' motion to dismiss articulated further grounds for the assertion of the law enforcement privilege with respect to the materials requested in the Ojeda subpoena:

> A person possessing these documents would learn, <u>inter alia</u>, how the FBI goes about capturing a fugitive who is believed to be dangerous, the number and types of personnel used by the FBI in such operations, the way the FBI collects evidence, the FBI's internal operating procedures in a variety of sensitive law enforcement settings, and the way in which law enforcement information (such as the location of Mr. Ojeda Rios) is gathered.

The United States further noted that most of the materials are also protected by the investigatory files privilege, and finally emphasized that the privacy interests of its agents favored nondisclosure of their names and other personal information. It made similar arguments with respect to the materials requested in the 444 de Diego subpoena, explaining that "the release of internal FBI protocols . . . would reveal law enforcement techniques" and that "[t]he release of the identity, rank, and division of the FBI

agents could also reveal law enforcement techniques, by revealing the manner in which the FBI staffs these types of operations."

We acknowledge that the procedures Puerto Rico references for the first time on appeal may enhance the ability of a district court to evaluate fully and fairly the interests at stake in a case such as this. Judging these interests in the abstract seems problematic. Here, however, Puerto Rico failed to request before the district court the procedures it now specifies. This failure constitutes a waiver of any objection premised on the absence of those procedures. See Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 33 (1st Cir. 2003). Moreover, the circumstances here mitigate the risk that the absence of such procedures caused an unfair result. The United States clearly and repeatedly asserted the law enforcement privilege as its ground for refusing to disclose the requested information, and it articulated more specific reasons with respect to the various categories of materials. There was no mistaking the basis for the FBI's refusal to provide the information. Finally, as the United States explains, Puerto Rico requested broad categories of information (i.e., all internal FBI protocols relating to certain types of operations). Those generalities did not help Puerto Rico establish the "authentic 'necessity,'" Cintolo, 812 F.2d at 1002, for the information it sought.

Puerto Rico also contends that the United States has waived any law enforcement privilege that may exist by disclosing some of the requested information in a detailed, two hundred page report.[12]  Again, Puerto Rico failed to raise this objection before the district court, and again Puerto Rico has waived it.[13]  In any event, the claim lacks merit.  Courts have held in the context of executive privilege that "release of a document only waives these privileges for the document or information specifically released, and not for related materials."  In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir. 1997); see also Smith v. Cromer, 159 F.3d 875, 880 (4th Cir. 1998)(explaining that "disclosure of factual information does not effect a waiver of sovereign immunity as to other related matters").  This limited approach to waiver serves important interests in open government by "ensur[ing] that agencies do not forego voluntarily disclosing some privileged material out of the fear that by doing so they are exposing other, more sensitive documents."  In re Sealed Case, 121 F.3d at 741.

---

[12] See U.S. Department of Justice, Office of the Inspector General, A Review of the September 2005 Shooting Incident Involving the FBI and Filiberto Ojeda Ríos, August 6, 2006, available at http://www.usdoj.gov/oig/special/s0608/full_report.pdf.

[13] Although the report was released after the parties filed their motions, Puerto Rico still had ample time to raise this issue before the district court.  The court did not issue a ruling until September 26, 2006, nearly two months after the report was released.  Indeed, the court cited the report in its opinion.

-32-

The United States has been reasonably forthcoming in releasing information related to the Ojeda intervention. The FBI allowed Puerto Rico to inspect bulletproof vests, helmets, weapons, and vehicles used during the intervention and the photographs taken before, during, and after the intervention. Moreover, the Office of the Inspector General also released a report detailing the findings of its investigation into the intervention. See supra note 12. It would be illogical to punish the United States for its voluntary disclosure of these materials by also forcing it to disclose other information that it has deemed privileged.

Having found that Puerto Rico's procedural claims lack merit, we turn now to the substance of the FBI's decision to withhold the requested materials.

## B. Ojeda Subpoena

The FBI refused to produce the materials specified in the Ojeda subpoena, which included the "Operation Order," identifying information for the agents involved in the intervention, reports and recordings related to the intervention, and a wide array of information regarding FBI protocols and operating procedures. As its basis for asserting the privilege with respect to this information, the United States explains that the requested materials include information about sensitive law enforcement techniques that must remain confidential to allow the FBI to operate effectively.

As the district court explained, the disclosure of these materials would reveal

> how the FBI goes about capturing a fugitive who is believed to be dangerous, the number and types of personnel used by the FBI in such operations, the way the FBI collects evidence, the FBI's internal operating procedures in a variety of law enforcement settings, and the way in which law enforcement information is gathered.

Disclosure of such information has the potential to thwart future FBI operations by publicizing the internal operations of that agency.

Given the qualified nature of the privilege, however, the critical question is whether Puerto Rico has shown a necessity for the information sufficient to overcome this qualified privilege. In favor of disclosure, Puerto Rico's chief argument is its interest in asserting its sovereign authority to investigate and prosecute its criminal laws. It explains that such authority is constitutional in nature, and thus deserves greater weight in our balancing calculus. It also emphasizes that no alternative means exists to obtain the information it seeks. Finally, Puerto Rico contends that an overbroad reading of the privilege is tantamount to granting federal officers immunity from even preliminary criminal investigations.

In response, the United States first explains that the balancing of interests typically takes place in the course of

underlying criminal or civil litigation, in which the court must weigh the policy of the privilege against the particular litigation need of a party. Here, however, there is no underlying litigation; the "need" is Puerto Rico's assertion that the requested materials might be of aid to a criminal investigation. The United States also notes that the Department of Justice has already undertaken an investigation of the intervention and published a detailed report of its findings. Finally, in response to Puerto Rico's claim that failure to release the information would foreclose investigation of the officers, the United States emphasizes that federal officials are generally immune from state prosecution for actions performed within the scope of their official duties, and thus the privilege would merely reflect an existing immunity.

With respect to this last point, the contentions of the parties deserve some elaboration. Courts have explained that "Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties." Wyoming v. Livingston, 443 F.3d 1211, 1213 (10th Cir. 2006). Such disputes "permit of no easy answers," but "the supremacy of federal law precludes the use of state prosecutorial power to frustrate the legitimate and reasonable exercise of federal authority." Id. Thus, federal officials are generally granted Supremacy Clause immunity from state prosecution for

actions taken in the course of their official duties.  See, e.g., In re Neagle, 135 U.S. 1, 75 (1890)(U.S. Marshal immune from state murder prosecution);  Livingston, 443 F.3d 1211 (10th Cir. 2006)(federal officials immune from state prosecution for trespass);  New York v. Tanella, 374 F.3d 141, 142 (2d Cir. 2004)(DEA agent who shot an unarmed suspect immune from state prosecution).  However, such immunity is limited to actions that were "reasonably necessary for the performance of [the officials'] duties."  Livingston, 443 F.3d at 1227-28.  In the present situation, the privilege that the United States now asserts could conceivably extend beyond the scope of the immunity actually available to the officers if the privilege was used to withhold information about acts not taken in the course of their official duties.

The sovereign interests at stake on both sides — Puerto Rico's interest in enforcing its criminal laws and the United States' interest in protecting the internal operations of the FBI — make our balancing of the interests particularly difficult in this case.  We recognize that any decision will necessarily compromise one of these interests to some degree.  On balance, however, we conclude that the FBI's decision not to release the requested materials was reasonable under the deferential standard of review prescribed by the APA.  The FBI has a legitimate interest in maintaining the secrecy of sensitive law enforcement techniques.

We recognize that, in addition to general information about FBI protocols and techniques, Puerto Rico also has requested names and other personal information about individual FBI agents. Superficially, this identifying information seems distinct from information about FBI protocols and techniques involved in the shooting death of Ojeda. However, the individuals at issue are not suspected of criminal activity unrelated to the operation that implicates those protocols and investigative techniques. Obtaining this identifying information would allow Puerto Rico to interview the individuals in question. Inevitably, those interviews would involve inquiries relating to the FBI protocols and techniques that fall within the privilege.

Moreover, as the district court noted in its opinion, disclosing certain information about the agents "would reveal the number and types of personnel used by the FBI" to conduct operations such as the Ojeda intervention. If agents' names, official photographs and other personal information are made available, as requested by Puerto Rico, these agents will be less successful at conducting covert operations. Finally, courts have explained that "individuals, including government employees and officials, have privacy interests in the dissemination of their names. Public disclosure of the names of FBI agents and other law enforcement personnel . . . could subject them to embarrassment and harassment in the conduct of their official duties and personal

-37-

affairs." Massey v. FBI, 3 F.3d 620, 624 (2d Cir. 1993)(citation omitted)(upholding the nondisclosure of FBI agents' names under Exemption 7 of FOIA); see also Jones v. FBI, 41 F.3d 238, 246-47 (6th Cir. 1994)(holding that "federal law enforcement officials 'have the right to be protected against public disclosure of their participation in law enforcement investigations'" (quoting Ingle v. U.S. Dep't of Justice, 698 F.2d 259, 269 (6th Cir. 1983))); Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 487 (D.C. Cir. 1980)("As several courts have recognized, [FBI] agents have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives.").

We acknowledge Puerto Rico's argument that the FBI's decision to withhold the information raises the possibility that a federal agency may thwart state criminal proceedings against one of its own employees by refusing to disclose information that might lead to prosecution. That is a troubling possibility. As we have explained, although federal officials generally receive immunity from prosecution, such immunity obtains only when they are acting within the scope of official duties. The FBI's refusal to produce the requested materials may preclude a determination of whether the actions at issue here were within that scope.

However, other circumstances present here minimize the likelihood that wrongdoing was improperly concealed. First, the

FBI acceded to some of Puerto Rico's requests for information, agreeing to allow Puerto Rico to inspect most of the physical evidence from the intervention and photographs of the premises taken before, during, and after the intervention. Moreover, the Office of the Inspector General ("OIG") — an entity entirely independent from the FBI — conducted a searching investigation of the events and made public a detailed two hundred page report of its findings. See supra note 12. In preparing the report, the OIG interviewed over sixty individuals, including all of the agents who planned, participated in, or had knowledge of the operation; reviewed thousands of pages of documents, including operation plans and orders, investigative files, intelligence reports, and FBI policies and procedures; reviewed forensic reports; and consulted with experts in tactical police operations. The report "identified a number of deficiencies in the FBI's conduct of the Ojeda surveillance and arrest operation" and made "ten recommendations dealing with these findings"; however, it "did not conclude that any of the actions of FBI officials constituted misconduct." We acknowledge that these safeguards are an imperfect substitute for Puerto Rico's ability to obtain information to conduct its own investigation; however, the availability of this substitute reinforces our conclusion that the FBI's decision to withhold the other materials was not arbitrary.

In sum, we find no error in the FBI's refusal to release

the information Puerto Rico requested in the Ojeda subpoena.

## C. 444 de Diego Subpoena

Under the APA, a party must obtain a "final agency decision" prior to seeking judicial review of an agency action. 5 U.S.C. § 704; Bennett v. Spear, 520 U.S. 154, 177-78 (1997). Here, Puerto Rico served the 444 de Diego subpoena on the FBI on February 20, 2006. The FBI then filed a motion to quash the subpoena on February 28. Puerto Rico contends that this motion to quash the 444 de Diego subpoena was the equivalent of a final agency action, while the United States asserts that it was not.

In its opinion ruling in favor of the United States, the district court held that no final agency action had taken place. It explained that, at the March 2 hearing on the United States' motion to quash, Puerto Rico stated that "right now there is no intention to file any contempt proceedings" and that it "currently was going to be evaluating which is the next step in order to continue that investigation; if the step is administrative, if it is federal judicial or if it is state judicial." The district court then advised Puerto Rico that it must exhaust its administrative remedies and obtain a final agency action in order to file suit. Puerto Rico's next action, however, was to file the complaint in this action on March 23. Consequently, the district court explained that Puerto Rico "has not submitted anything into the record indicating that the government made a final decision,"

implicitly holding that the motion to quash could not itself constitute a final agency action, and thus no final agency action had taken place.

The issue of whether the United States' motion to quash the subpoena was final agency action is a thorny one. Courts have held that "an agency's refusal to comply with a subpoena constitutes 'final agency action . . . ripe for . . . review under the APA.'" Yousuf v. Samantar, 451 F.3d 248, 251 (D.C. Cir. 2006)(quoting COMSAT Corp. v. Nat'l Sci. Found., 190 F.3d 269, 275 (4th Cir. 1999)). Indeed, in United States v. Williams, 170 F.3d 431, 434 n.4 (4th Cir. 1999), "the government asserted and [the party requesting information] did not dispute that the United States Attorney's response to a subpoena constitutes final agency action for purposes of the APA." No court has held, however, that filing a motion to quash is the equivalent of a refusal to comply. Moreover, at the hearing on the motion to quash, Puerto Rico's acknowledgment that it was exploring other avenues of obtaining the materials it had requested, including administrative avenues, suggests that Puerto Rico itself did not believe that it had obtained final agency action.

The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review. Cobell v. Kempthorne, 455 F.3d 301, 304 (D.C. Cir. 2006). However, we have

held that cases exist in which we may exercise "hypothetical jurisdiction" — that is, cases "in which we may — and should — bypass the jurisdictional question" because the jurisdictional issue is complex but the outcome on the merits is straightforward. See, e.g., Royal Siam Corp. v. Chertoff, 2007 WL 1228792 at *4 (1st Cir. Apr. 27, 2007). In exercising such hypothetical jurisdiction, "we have distinguished between Article III jurisdiction (which may never be bypassed) and statutory jurisdiction (which may occasionally be bypassed)." Id. Here, the question of whether there has been final agency action is one that implicates statutory, rather than constitutional, jurisdiction. See Air Brake Systems, Inc. v. Mineta, 357 F.3d 632, 638 (6th Cir. 2004)("[T]he jurisdictional question here is one of statutory interpretation: [was there] 'final' agency action for which no other adequate judicial remedy exists?"); Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 442 (D.C. Cir. 1986)(discussing "the statutory jurisdictional issue of whether [there was] 'final agency action'"). Thus, given the difficulty of the jurisdictional issue here, we conclude that it is appropriate to bypass that issue and proceed to the more straightforward task of resolving the merits.

The materials requested by Puerto Rico in the 444 de Diego subpoena are substantially similar to the materials already discussed with respect to the Ojeda subpoena: (1) the name, rank, division, address, and telephone number of two FBI agents; (2) an

-42-

official photograph of each of the two FBI agents; and (3) internal FBI protocols relating to the use of force and pepper spray.  These materials fall within the scope of the law enforcement privilege for the same reasons that the names and personal information of FBI agents and the internal FBI protocols requested in the Ojeda subpoena fell within that privilege, and Puerto Rico has offered no more compelling reasons for disclosure in the case of the materials requested in the 444 de Diego subpoena.  Thus, assuming that Puerto Rico obtained final agency action with respect to its request for these materials, the FBI was neither arbitrary nor capricious in withholding such information.

**V.**

After careful review, we conclude that Puerto Rico cannot assert a nonstatutory cause of action, grounded in its constitutional sovereign authority to enforce its criminal laws, to obtain the materials it seeks.  Instead, we find Puerto Rico's request for these materials subject to review under the APA.  Moreover, we hold that a qualified privilege applies to the law enforcement materials Puerto Rico has requested here: sensitive law enforcement protocols and techniques and the names and other personal information of the FBI agents involved in the two operations.  In light of this privilege and the applicable Touhy regulations, we conclude that the FBI's response to the Ojeda subpoena and the 444 de Diego subpoena was neither arbitrary nor

-43-

capricious.  Thus, the judgment of the district court is <u>affirmed.</u>

**<u>So ordered.</u>**

**- Concurring Opinions Follow -**

-44-

**BOUDIN**, <u>**Chief Judge**</u>, **concurring**.   It has been long settled that the United States cannot be sued, either in federal court or in any state forum, unless it has waived sovereign immunity.  <u>Lehman</u> v. <u>Nakshian</u>, 453 U.S. 156, 160 (1981).  States and comparable entities are treated no differently than any other litigant.  Indeed, the lower courts have repeatedly held that, absent a waiver, the United States cannot be forced to obey a subpoena issued by a state court, state grand jury, or state legislative committee.[14]

Puerto Rico's lawsuit in federal court, seeking to enforce the state's demand for a turnover of documents and exhibits belonging to or in the custody of the FBI, is itself barred by sovereign immunity unless it falls within an exception--which normally must be created by Congress.  This is not an instance of discovery in aid of a federal lawsuit to which the United States has otherwise consented (<u>e.g.,</u> a Tucker Act suit against the United States) or to which it is otherwise susceptible to discovery (<u>e.g.,</u> a federal criminal prosecution).

---

[14]<u>See, e.g.,</u> <u>United States</u> v. <u>Williams</u>, 170 F.3d 431, 433 (4th Cir.), <u>cert. denied</u>, 525 U.S. 854 (1999); <u>In re Elko County Grand Jury</u>, 109 F.3d 554, 556 (9th Cir.), <u>cert. denied</u>, 522 U.S. 1027 (1997) (sovereign immunity bars enforcement of state grand jury subpoena of federal official); <u>Houston Bus. Journal, Inc.</u> v. <u>Office of the Comptroller of the Currency</u>, 86 F.3d 1208, 1212 (D.C. Cir. 1996); <u>State of La.</u> v. <u>Sparks</u>, 978 F.2d 226, 234-35 (5th Cir. 1992); <u>Boron Oil Co.</u> v. <u>Downie</u>, 873 F.2d 67, 71 (4th Cir. 1989); <u>United States</u> v. <u>McLeod</u>, 385 F.2d 734, 751 (5th Cir. 1967); <u>United States</u> v. <u>Owlett</u>,, 15 F. Supp. 736, 742 (M.D. Pa. 1936).

So far as Puerto Rico is asserting an implied exception to federal sovereign immunity for state criminal investigations, the proposition is without case support and is at odds with a catalogue of cases. See note 14, above. Puerto Rico is free to conduct criminal investigations. It is not free to bring a federal or state lawsuit to obtain by court process, at the behest of a state agency, documents and exhibits controlled by the United States, unless Congress has so provided.

The United States has waived sovereign immunity in a number of different statutes, including the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (2000) (certain torts), the Tucker Act, id. § 1346(a) (contracts), and the Freedom of Information Act, 5 U.S.C. § 552 (2000) (access to many documents). Puerto Rico does not invoke the FOIA, presumably because one of its exceptions limits requests for criminal investigative materials.[15]  5 U.S.C. § 552.

---

[15]The Freedom of Information Act excepts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, . . . (D) could reasonably be expected to disclose the identity of a confidential source . . . , (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7).

This leaves Puerto Rico with the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.  The APA can be viewed both as a residual waiver of sovereign immunity permitting judicial review of federal action--though not an award of damages--where there is no other prescribed remedy; and as a federal cause of action where an agency acts contrary to law or in a manner that is arbitrary or irrational (unless the matter is one committed to agency discretion by law, id. § 701(a)(2)).  See H.R. Rep. 94-1656, at 4-12 (1976).

Puerto Rico points to no law requiring the turnover of the materials it seeks.  So far as Puerto Rico asserts its own sovereign interest in law enforcement, this interest creates no cause of action--state or federal--that permits Puerto Rico to constrain the United States.  See U.S. Const. Art. VI, cl. 2; McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 436 (1819) ("the states have no power . . . to retard, impede, burden, or . . . control" the execution of federal powers); cf. In re Neagle, 135 U.S. 1, 75 (1890).

Congress has authorized each agency to create housekeeping regulations governing the use of its "records, papers, and property," 5 U.S.C. § 301, and the Department's pertinent regulations forbid disclosure of any information where

> [d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures

the effectiveness of which would thereby be impaired,

unless the "administration of justice requires disclosure." 28 C.F.R. § 16.26(b)(5), (c). Yet the Department's regulations, by their explicit terms, create no substantive rights in litigants, 28 C.F.R. § 16.21(d), and so create no legal obligation enforceable under the APA.

This leaves Puerto Rico, at best, with an APA suit to challenge agency action as arbitrary and capricious. Some courts have recognized an action under the APA to challenge the reasonableness of the agency's action in withholding documents.[16] Whether this is a plausible claim--given the explicit treatment of document requests under the FOIA--might be debated. But the present case would turn out the same way even if such an APA claim survived the precept lex specialis derogat legi generali. In re Lazarus, 478 F.3d 12, 19 (1st Cir. 2007).

There is nothing arbitrary or capricious about the Department's policy of refusing to reveal "records compiled for law enforcement purposes" that would "disclose investigative techniques

---

[16]"If the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA." Houston Bus. Journal, 86 F.3d at 1212. See also Comsat Corp. v. Nat'l Sci. Found., 190 F.3d 269, 274 (4th Cir. 1999); Williams, 170 F.3d at 434; Edwards v. U.S. Dep't of Justice, 43 F.3d 312, 316-17 (7th Cir. 1994); Boron Oil, 873 F.2d at 71; cf. Gen. Elec., 197 F.3d at 598-99, modified on reh'g, 212 F.3d at 690.

and procedures the effectiveness of which would thereby be impaired."  28 C.F.R. § 16.26.  The Department's legitimate interest is self-evident and is reflected in both the FOIA categorical exception, see note 16, above, and in judicial recognition of a law enforcement privilege, Roviaro v. United States, 353 U.S. 53, 59 (1957).

Nor did the Department act arbitrarily or capriciously in applying its general policy in this case.  As the district court found, the materials sought by Puerto Rico and withheld by the Department would reveal the identities of FBI agents, "how the FBI goes about capturing a fugitive who is believed to be dangerous, the number and types of personnel used by the FBI in such operations, the way the FBI collects evidence, the FBI's internal operating procedures in a variety of law enforcement settings, and the way in which law enforcement information is gathered."[17]

That in this case the materials might be protected under the federal law enforcement privilege is icing on the cake, but the Department's action would be reasonable even without the privilege. When the United States tries a defendant in its own courts, no

---

[17]These materials included the "operation order" relating to the FBI raid on Ojeda's residence; the identities and photographs of the agents involved in the raid and those responsible for using pepper spray; information gathered during the FBI's occupation of Ojeda's residence; copies of expert reports, photographs, and recordings related to the raid; and internal protocols concerning violent and arrest interventions and use of force.

issue of sovereign immunity is presented: disclosure obligations depend on federal criminal rules and precedents and, ordinarily, material in government hands must be produced in response to such requirements or a defense subpoena unless privileged.

By contrast, when Puerto Rico is seeking materials in an action not otherwise properly in federal court, the United States has no independent obligation to turn over government materials regardless of whether they are privileged; at most, it must avoid action that is arbitrary and capricious and can do so on the basis of a reasonable general policy. The Department's refusal to release the information in this case was not arbitrary and capricious and that is the end of the matter.

**SHADUR**, <u>District Judge</u>, **concurring**.  In this instance the thoughtful opinions by Judge Lipez and Chief Judge Boudin put me in mind of the old saw about the politician who says of a controversial issue, "Some of my friends are in favor of X, and some of my friends are in favor of Y, and I'm in favor of my friends."  Both opinions reach the same destination, albeit by different routes, and at the end of the day I share their common conclusion that the Commonwealth's legitimate interest in pursuing a possible criminal prosecution cannot override the legitimate policy concerns of the United States, as the ultimate sovereign, in not unduly exposing its own law enforcement techniques and personnel against its wishes.

In that respect Congress has permissibly acted to limit judicial review of those policy concerns to the standards applicable under the APA, and the Commonwealth has not surmounted the high hurdle that statute prescribes.  Hence I concur in the conclusion reached in each of the two opinions.